129 P.3d 542

**CITY AND COUNTY OF HONOLULU, a municipal corporation of the State of Hawaii, Plaintiff–Appellee/Cross–Appellant/Cross–Appellee,**

v.

**James M. SHERMAN, also known as James Malcolm Sherman, and Akiko S. Sherman, also known as Akiko Sakiyama Sherman, as Trustees under that certain unrecorded James M. Sherman and Akiko S. Sherman Revocable Trust dated May 2, 1989; Jan Camille Bellinger, Trustee under the Jan Camille Bellinger Revocable Living Trust, under that certain unrecorded Trust, Agreement dated November 23, 1993, Clarence K. Lee, as Trustee of and for the Clarence K. Lee Revocable Trust, under that certain unrecorded Trust Agreement dated January 28, 1992, as amended; and Myrna P. Chun–Hoon, Successor Trustee under that certain unrecorded Revocable Trust of Albert C.K. Chun–Hoon dated October 11, 1984, as amended, and Myrna P. Chun–Hoon, Trustee under that certain unrecorded Revocable Trust of Myrna P. Chun–Hoon, dated October 11, 1984, as amended, George B. Garis, also known as George Benjamin Garis, as Trustee under that certain unrecorded George B. Garis Revocable Trust dated November 28, 1989, as amended; Chinh Trong Le; Karen Wilson Rosa; Elizabeth W. Takahashi, Trustee of the Elizabeth W. Takahashi Revocable Living Trust under that certain unrecorded Trust Agreement dated July 14, 1993, Stuart Edwin Gross, as Trustee under that certain unrecorded Trust Agreement known as The Stuart E. Gross Trust dated February 19, 1985, and Marcia Kurzweil Gross, as Trustee under that certain unrecorded Trust Agreement known as The Marcia K. Gross Trust dated February 19, 1985; John Philip Spierling; Mark Sperry and Mollie Sperry, Co–Trustees of the Mark Sperry Revocable Trust dated May 29, 1989, and Mollie Sperry and Mark Sperry, Co–Trustees of The Mollie Sperry Revocable Trust dated May 29, 1989;**

40

Sayuri Taniguchi and Erica Taniguchi Dorman; Kenneth Graham Patterson and Lillian Papacolas Patterson; Moses Mosai Lo and Sheila Dickenson Lo; Frank K. Min, also known as Frank Kui Pong Min, and Elaine N. Min, also known as Elaine Nam Min, Trustees under that certain Trust Agreement dated April 9, 1985, and Elaine N. Min, also known as Elaine Nam Min and Frank K. Min, also known as Frank Kui Pong Min, Trustees under that certain Trust Agreement dated April 9, 1985; Arthur R. King, Jr., and Ruth Mildred King, Co–Trustees of the unrecorded Arthur R. King, Jr. Trust Agreement dated May 18, 1990; and Ruth Mildred King and Arthur R. King, Co–Trustees of the unrecorded Ruth Mildred King Trust Agreement dated May 18, 1990; Deanna Lou Levy, as Trustee under that certain unrecorded Trust Agreement known as The Deanna Lou Levy Revocable Trust dated December 4, 1990; Robert G. Lees and Yuko Lees, Co–Trustees under that certain unrecorded Trust Agreement known as The Yuko Lees Trust dated June 14, 2000; Elisabeth Kehrer Anderson, as Trustee of the Elisabeth Kehrer Anderson Revocable Living Trust Agreement dated June 29, 1981, as amended and restated; Ramez Bassir; Paul John Casey, as Trustee under that certain unrecorded Self–Trusteed Trust dated August 31, 1987, and Janice Yoko Casey, as Trustee under that certain unrecorded Self–Trusteed Trust dated May 20, 1988; George Henry Lumsden and Joanne Chun Lumsden; Ann Takako Yamamoto, as Trustee of the Self–Trusteed Trust Agreement of Ann Takako Yamamoto, under unrecorded Trust Agreement of Ann Takako Yamamoto dated April 10, 2000; Frances M. Watanabe, Trustee under that certain unrecorded Frances M. Watanabe Revocable Trust dated April 2, 1993, Meredith Kwock Leong Pang; Neil Simms Bellinger, Trustee under that certain unrecorded Neil S. Bellinger Revocable Living Trust dated November 20, 2002; Wallace Lee Young and Ernestine Ching Young; Joyce A Hagin and Law-

rence Reich; David Patrick Kelly and Keiko Kelly; Patricia Carleen Brown, Trustee for the Patricia Carleen Brown Revocable Trust Agreement dated January 21, 1993; Randy Neil Yeager and Susan Kaycie Yeager; and Gail Suzanne Koglman, Defendants–Appellants/Cross–Appellees,

and

First United Methodist Church, a Hawaii non-profit corporation, Defendant–Appellee/Cross–Appellee/Cross–Appellant,

and

John Doe 1–200; Mary Doe 1–200; Doe Partnership 1–100; Doe Corporation 1–100; Doe Non–Profit Corporation 1–100; Doe Entity 1–100, Defendants.

No. 26896.

Supreme Court of Hawai'i.

Feb. 28, 2006.

As Corrected March 22, 2006.

John P. Manaut, of Carlsmith, Ball LLP (James H. Case and John P. Manaut of Carlsmith Ball LLP on the briefs), Honolulu, for defendant/appellants/cross-appellees James M. Sherman, et al.

Lex R. Smith, of Kobayashi, Sugita & Goda (Lex R. Smith and Ann C. Teranishi of Kobayashi, Sugita & Goda, Honolulu, and Carrie Okinaga, Corporation Counsel and Winston K.O. Wong, Deputy Corporation Counsel on the briefs), for plaintiff-appellee/cross-appellant/cross-appellee City and County of Honolulu.

James K. Mee of Ashford & Wriston (James K. Mee, Rosemary T. Fazio, and Kevin W. Herring of Ashford & Wriston, on the briefs), Honolulu, for defendant/appellee/cross-appellee/cross-appellant First United Methodist Church.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., and Circuit Judge SAKAMOTO, in place of ACOBA, J., Recused.

Opinion of the Court by LEVINSON, J.

This appeal involves the interpretation and application of Ordinance 91–95 of the City and County of Honolulu, as codified in Revised Ordinances of Honolulu (ROH) Chapter 38 (1991). ROH ch. 38, entitled "Residential Condominium, Cooperative Housing and Residential Planned Development Leasehold Conversion," established the authority of the City and County of Honolulu to file eminent domain actions for a lease-to-fee conversion of certain leased-fee interests.[1]

---

1. Specifically, ROH ch. 38 authorized the City and County of Honolulu to

acquire, either by voluntary purchase or through exercise of the power of eminent domain, the fee simple interest in land situated underneath condominium developments from the fee owners of the land in order to convey fee simple title to the owner-occupants of the condominium units, who, prior to the City's

acquisition, leased the fee interests from the fee owners. As such, ROH ch. 38 provides a mechanism by which condominium owners may convert their leased fee interests into fee simple interests appurtenant to their condominium units. ROH ch. 38 authorizes the City's Department of Housing and Community Development to promulgate administrative

The present matter arises out of a condemnation action filed by the plaintiff-appellee/cross-appellant/cross-appellee City and County of Honolulu [hereinafter, "the City"], pursuant to its eminent domain power, in which it originally designated twenty-eight units and later amended the designation to add six units within the Admiral Thomas condominium complex (the Admiral Thomas) for conversion from leasehold to fee simple on behalf of forty-seven owner-occupant applicants (collectively, the lessees).[2] The defendant-appellant/cross-appellee/cross-appellant First United Methodist Church [hereinafter, "the Church"], the fee owner of the Admiral Thomas, opposed condemnation and counterclaimed for violations of (1) federal and state constitutional rights of separation of church and state and freedom of religion, (2) the federal Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc *et seq.* (2000)[3] and (3) federal civil rights.

The three parties to the action, *i.e.*, the City, the Church, and the lessees, moved for summary judgment on the complaint on various grounds. The circuit court ruled in favor of the Church and against the City and lessees by finding that because the Admiral Thomas is a "mixed-use" condominium project, it does not qualify for conversion under ROH ch. 38 and that there was an insufficient number of qualified applicant units to acquire the fee. On the other hand, the circuit court ruled in favor of the City and the lessees and against the Church by finding that the City Council of the City and County of Honolulu did not improperly delegate the power of eminent domain to the Department of Community Services (DCS) and that RLUIPA is inapplicable as a defense to conversion under ROH ch. 38.

As discussed more fully *infra* in section III, the lessees argue on appeal (1) that the circuit court impermissibly legislated an exception to ROH ch. 38 by classifying the Admiral Thomas as a "mixed-use" building rather than applying the plain meaning of ROH ch. 38 to the defined 148 residential

rules in order to facilitate the lease-to-fee conversion process.
*Coon v. City and County of Honolulu,* 98 Hawai'i 233, 237 n. 1, 47 P.3d 348, 352 n. 1 (2002). Effective February 9, 2005, the City Council of the City and County of Honolulu passed Bill 53/Ordinance 05–001, which repealed ROH Ch. 38. Nevertheless, the repeal of ROH Ch. 38 does not affect the present matter, inasmuch as the City Council had already authorized the eminent domain proceeding at issue. *See* Ordinance 05–001 § 3(b) ("Any designation of a development for leasehold conversion shall be invalid on the effective date of this ordinance if the council did not authorize before the effective date of this ordinance the eminent domain proceeding to acquire all or a portion of the leased fee interests to the development.").

2. The lessees are James Sherman, Akiko Sherman, Jan Bellinger, Clarence Lee, Myrna Chun–Hoon, George Garis, Chinh Le, Karen Rosa, Elizabeth Takahashi, Stuart Gross, Marcia Gross, John Sperling, Mark Sperry, Mollie Sperry, Sayuri Taniguchi, Erica Dorman, Kenneth Patterson, Lillian Patterson, Moses Lo, Sheila Lo, Frank Min, Elaine Min, Arthur King, Jr., Ruth King, Deanna Levy, Robert Lees, Yuko Lees, Elisabeth Anderson, Ramez Bassir, Paul Casey, Janice Casey, George Lumsden, JoAnn Lumsden, Ann Yamamoto, Francis Watanabe, Meredith Pang, Neil Bellinger, Wallace Young, Ernestine Young, Joyce Hagin, Lawrence Reich, David Kelly, Keiko Kelly, Patricia Brown, Randy Yeager, Susan Yeager, and Gail Koglman.

3. RLUIPA provides in relevant part:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
 (A) is in furtherance of a compelling governmental interest; and
 (B) is the least restrictive means of furthering that compelling governmental interest.
(2) Scope of application
This subsection applies in any case in which—
 (A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;
 (B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or
 (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.
42 U.S.C. § 2000cc(a) (2000).

units located on the property and (2) that disqualifying three of the lessee applicant units and subsequently determining that the number of qualified applicant units fell below the twenty-five necessary for condemnation was erroneous.

The City argues on cross-appeal that the inclusion of the words "mixed-use" in the condominium declaration for the Admiral Thomas did not provide any legal basis to disqualify the conversion of the Admiral Thomas units from leasehold to fee simple under ROH ch. 38.

The Church argues on cross-appeal: (1) that the City Council impermissibly delegated the power of eminent domain to the DCS; (2) that RLUIPA is an applicable defense to the condemnation of fee simple residential property owned by the Church; and (3) that the affidavits of the Administrator of the City's Leasehold Conversion Program, Sally Cravalho, which stated that the lessees were qualified under ROH ch. 38 to participate in the lease-to-fee conversion program, were hearsay and should have been deemed inadmissible as evidence of the lessees' qualifications, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 56(e).[4]

This court has never had occasion to address (1) whether ROH ch. 38 is inapplicable to religious institutions owning land in fee simple, (2) whether a building's designation as "mixed-use" excludes it from condemnation pursuant to ROH ch. 38, or (3) whether RLUIPA is a valid defense to the application of ROH ch. 38 to property owned by a religious institution.

For the reasons discussed more fully *infra* in section III, we hold (1) that ROH ch. 38 does not provide an exception to lease-to-fee conversion of "mixed-use" buildings, (2) that

RLUIPA does not provide a defense to condemnation of the Admiral Thomas condominium units owned in fee simple by the Church, (3) that the City Council did not impermissibly delegate the power of eminent domain to the DCS, (4) that there are genuine issues of material fact as to whether the requisite number of applicant units exists to acquire the fee pursuant to ROH ch. 38, and (5) that Cravalho's affidavits do not run afoul of HRCP Rule 56(e).

Accordingly, we affirm the circuit court's grant of summary judgment in favor of the City and lessees and against the Church, which found that RLUIPA is not available as a defense to condemnation and that the City Council did not improperly delegate the power of eminent domain. However, we reverse the circuit court's ruling that ROH ch. 38 is inapplicable to the Admiral Thomas condominium complex, inasmuch as there are no genuine issues of material fact as to whether the Admiral Thomas is a residential condominium property regime project created under Hawai'i Revised Statutes (HRS) Chapter 514A, the Condominium Property Act. In addition, we vacate the circuit court's denial of summary judgment based on its ruling that there were not qualified applicant units for at least twenty-five units and remand to the circuit court for further proceedings to determine whether there are sufficient qualified units for conversion to fee simple based upon, *inter alia*, the applicants' qualifications as of the date that their respective applications were filed with the City, and, if so, to hear evidence of the fair market value of the leased fee interests being acquired.

## I. *BACKGROUND*

On May 8, 2003, the City filed a complaint in eminent domain, pursuant to HRS § 101–

---

4. HRCP Rule 56(e) provides:
 **Form of Affidavits; Further Testimony; Defense Required.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depo-

sitions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

13 (1993),[5] in the circuit court of the first circuit, seeking condemnation of the leased-fee interests in the Admiral Thomas condominium complex. On June 10, 2003, the Church filed its answer to the City's complaint, along with a counterclaim and a demand for jury trial. The Church alleged, *inter alia,* that the relief sought by the City in its complaint was barred because application of ROH ch. 38 to the Admiral Thomas: (1) violated the due process, equal protection, and property rights of the Church as protected by the fifth and fourteenth amendments to the United States Constitution and article I, sections 5 and 20 of the Hawaiʻi Constitution; (2) impermissibly burdened the Church's right to free exercise of religion as protected by the first amendment to the United States Constitution and article I, section 4 of the Hawaiʻi Constitution; (3) violated the Church's right to protection under RLUIPA; and (4) was barred because the Admiral Thomas is not a residential condominium property regime. On June 23, 2003, the defendant-appellants/cross-appellees lessees James M. Sherman *et al.* [hereinafter, "the lessees"] filed their answer to the City's complaint.

On April 29, 2004, the lessees filed a motion for partial summary judgment on the legal issue of public use and the qualifications of the individual lessees to purchase the fee interest in their units pursuant to ROH ch. 38. The lessees contended that there were no genuine issues of material fact regarding the public use for condemnation from lease to fee or the qualification of thirty-two units in the Admiral Thomas and that the sole issue remaining for trial was a determination of the valuation of the fee simple interests in the units. On May 7, 2004, the City joined in the lessees' motion for partial summary judgment.

On May 14, 2004, the Church filed a motion for partial summary judgment on the issue of improper delegation. On May 17, 2004, the Church filed a second motion for partial summary judgment on the issue of the alleged non-applicability of ROH ch. 38 to the Admiral Thomas condominium complex. On May 27, 2004, the Church filed a memorandum in opposition to the lessees' motion for partial summary judgment. In its memorandum in opposition, the Church argued that Cravalho's affidavits constituted inadmissible hearsay and violated HRCP Rule 56(e) because they included "conclusory facts and conclusions of law [that] cannot be considered by the [c]ourt."

On June 4, 2004, the circuit court, the Honorable Victoria S. Marks presiding, conducted a hearing on all of the foregoing motions. The circuit court orally expressed its inclinations in ruling on the parties' motions as follows:

THE COURT: I've read everything that's been submitted, not word for word when it comes to all the exhibits, but everything else has been … reviewed. I will tell you my inclination in very succinct terms, and then if you need to make further arguments, certainly you can[.]

On the Defendant Lessees' Motion for Summary Judgment, the [c]ourt's inclination is to deny that motion. The opposition really raised four main issues in terms of whether [Cravalho]'s affidavit from the City was adequate. I think that it was [insofar as it] detailed what actions the [C]ity's employee took, what facts she reviewed and what conclusions she made. So that piece of opposition was not persuasive to the [c]ourt.

On the issue of whether there were 25 qualified lessees, I have a number of questions there, because there seems to be disputed facts, and I don't know if all the facts are really agreed to or not, but on that issue, whether you just need 25 to trigger or 25 continuous, it's the [c]ourt's view that you need 25 qualified lessees on a continuous basis, otherwise I think the whole issue of public use could be nullified.

5. HRS § 101–13 provides in relevant part:
 **Exercise of power by county.** Whenever any county deems it advisable or necessary to exercise the right of eminent domain in the furtherance of any governmental power, the proceedings may be instituted as provided in section 101–14 after the governing authority (county council, or other governing board in the case of an independent board having control of its own funds) of the county has authorized such suit by resolution duly passed, or adopted and approved, as the case may be.

You could have a triggering mechanism with 30 people and 10 or 20 of them could drop out during the process, but if you just use the trigger as the only thing, I don't think that's—that's a problem, but on the facts there, whether you have 25 continuous applicants, I think there's disputed facts on that ... point. And maybe the parties could enlighten me whether the facts are really disputed or not or whether you have an agreement there.

On the Religious Land Use and Institutionalized Persons Act, the [c]ourt's view is that it does not apply, that really you're addressing secular activities of the church through the proposed condemnation.

On improper delegation, that really goes to one of the other motions.

And on the [C]hurch's motion alleging improper delegation to the Department of Community Services, the [c]ourt's inclination is to deny that motion, especially in light of the *Richardson* and *Coon* decisions.

And then the ... [C]hurch's motion regarding non-applicability of Chapter 38, the Court's inclination is to grant the motion.

The declaration of horizontal property regime indicates that the property regime was a mixed use project, the bylaws even indicated mixed use project, mixed use condominium. Exhibit C to Exhibit 2 of the declaration of horizontal property regime again indicates mixed use project, and I think that it is very different than a horizontal property regime that is for residential purposes only. And the argument that a residential condominium can have other uses like a convenience store or restaurant or whatever, that does not change the residential use as opposed to, from the outset, a horizontal property scheme indicating that the project itself is mixed use.

The parties subsequently argued their positions. The Church contested Cravalho's affidavits as follows:

[CHURCH'S COUNSEL]: [T]hese applications are submitted in the year 2000 and they're taken at face value by [the DCS] for things that are five years out of date. I mean, we first questioned whether that is, in fact, what occurred or whether [the DCS] had seen these earlier. The second we question whether that's sufficient at that point to form a basis to find somebody qualified.

I'd like to clarify one thing. We don't dispute that Sally C[ra]valho did what she did in terms of reviewing applications and the other information and making the decisions she made, but *we don't think that her affidavits are sufficient to go to the truth of the matter asserted, which is, in this case, whether the lessees themselves actually met the qualifications.* That's a matter to which they ... themselves have to attest to. It's not enough for [Cravalho] to say, well, I got a communication from X that told me that Y lived in this unit for this certain amount of time. We have multiple levels of hearsay that I think have to be addressed. So we're not disputing her statements about what she did, we are disputing whether that's sufficient to support the underlying facts.

(Emphasis added.)

Regarding the requisite minimum number qualifying condominium units, the circuit court and the lessees' counsel engaged in the following colloquy:

[LESSEES' COUNSEL]: Your Honor, I would submit that ... we do have 27 [qualifying units] now and we do qualify with that minimum number. I understand that there is some concern about the number ever dropping below [25] at any given point, and what we would submit is that when you follow the initial 28 who were designated, and you even apply this number at the time that the condemnation was initiated, there were a minimum of 25 [units] that did qualify. We don't believe there is any genuine issue of disputed fact about the three [lessee-applicants] that are raised here based on positions in our brief.

THE COURT: [T]he facts regarding [lessee-applicants] Mr. Bellinger, Ms. Chun–Hoon, and ... Mr. Lumsden, based on those facts, the [c]ourt would conclude that those individuals were not qualified.

[LESSEES' COUNSEL]: The three that we have raised as far as the original

applicants that would qualify in our view has [been] maintained throughout. The [ ] two that dropped out, Plotts and Powers, clearly don't apply. But ... our view is that there is no disputed issue ... of fact[ ] that at the time the applications were submitted for two of these three, at minimum the challenged persons, *that they do qualify and should be ruled here as qualifying based on the date of the submission of their applications. ...*

. . . .

THE COURT:.... Based on what I have said, either there's a material question of fact regarding Bellinger, Chun–Hoon, Lumsden, and so the motion would be denied, or if the facts are not disputed, then the [c]ourt concludes that based on those facts, those three individuals were not proper lessees for determining 25 [units], and based on that, the number falls below 25, and on that basis the motion would be denied.

[LESSEES' COUNSEL]: Again, we would submit that it's not genuinely disputed ... based on the materials that we have submitted showing the application dates and that these persons did qualify at the date of their application. So our ... view is as a matter of law, viewing the application requirements, they do qualify.

THE COURT: And I'm looking at all of the ... date[s] and all of the circumstances. If I go through that, for example, ... Mr. Bellinger acquired his Admiral Thomas unit ... October 1st, [19]97, he applied or he completed the application May 13th, [19]98, he owned property at the Royal Iolani at that time, that property was subsequently sold June 15, [19]99, and his application was actually was actually submitted to the City November 1st, 2000.

. . . .

THE COURT: And based on those facts, the [c]ourt concludes that he was not a proper lessee for purposes of [ROH ch.] 38.

[LESSEES' COUNSEL]: [S]o ... our view that the delivery, the filing date of the application, would not be the applicable date for purposes of determining compliance? . . . .

THE COURT: I'm [ ] looking at a totality of the circumstances rather than ... focusing on just one date, and under these facts, ... the [c]ourt concludes that he's not a proper lessee under [ROH ch.] 38.

With ... Ms. Chun–Hoon, [ ] she actually ... dated her application ... October 19th, 2000, that was submitted to the City November 1, 2000. At that time, she had an interest in three pieces of property[;] Kaneohe Bay Drive, Alewa Heights ..., and vacant land in Kahaluu. She was informed by the City that ... those interests in the property disqualified her from being a proper lessee for [ROH ch.] 38. She then conveyed her interest in these properties to her daughter through an irrevocable trust and then reapplied on April 22, 2002.... [T]hose facts, I don't believe, are disputed, and based on the totality of those facts, the [c]ourt concludes that she's not a proper lessee for [ROH ch.] 38 purposes.

Next is Mr. Lumsden. He completed his application August 31st, 1995. He then inherited ... fee simple property at 999 Wilder. That property was conveyed to him in September [19]99, he sold it November [19]99, his application was submitted to the City November 1st, 2000. Based on those facts, ... the [c]ourt concludes that he's not a proper lessee for purposes of [ROH ch.] 38.

(Emphasis added.)

On June 21, 2004, the circuit court entered an order denying the Church's motion for partial summary judgment on the issue of improper delegation, concluding that the City Council did not improperly delegate the power of eminent domain to the DCS.

On June 30, 2004, the circuit court entered an order granting the Church's second motion for partial summary judgment, ruling ROH ch. 38 inapplicable to the Admiral Thomas. On July 8, 2004, the circuit court entered an order granting in part and denying in part the lessees' motion for partial summary judgment. The circuit court concluded (1) that RLUIPA was unavailable as a defense to the application of ROH ch. 38, (2) that there were not qualified original or properly-added applicants for at least 25

units continuously throughout the legal proceedings to convert the leaseholds to fee simple, (3) that ROH ch. 38 was inapplicable to the Admiral Thomas condominium project, and (4) that the City Council did not improperly delegate the power of eminent domain.

On July 9, 2004, the lessees filed a motion for reconsideration and clarification of the circuit court's (1) June 30, 2004 order granting the Church's motion for partial summary judgment and (2) July 8, 2004 order granting in part and denying in part their motion for partial summary judgment, or, in the alternative, for HRCP Rule 54(b)[6] certification for immediate appeal. On July 13, 2004, the City filed a partial joinder in the lessees' motion to clarify and reconsider.

On August 19, 2004, the circuit court conducted a hearing on the lessees' motion. The circuit court orally ruled in relevant part as follows:

> The motion's denied. The [c]ourt's looking at [ROH ch.] 38 in its entire[t]y, not singling out any one provision or another. And basically, is this a . . . residential condominium regime project or a mixed use project[?] And, clearly, based on the . . . documents, it's a mixed use project.
>
> In terms of the calculating the minimum number of qualified applicants, the [c]ourt agrees with the comments that [the Church's counsel] has made and is following [*Housing Finance and Devel. Corp. v.] Takabuki* [, 82 Hawai'i 172, 921 P.2d 92 (1996),] in that you need to maintain a minimum number of applicants throughout.
>
> . . . .
>
> [T]he Rule 54[ (b) ] Certification is granted. There's just no reason for delay, and . . . the [c]ourt expressly directs the entry of judgment.

**6.** HRCP Rule 54(b) provides in relevant part:

**Judgment upon multiple claims or involving multiple parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the

On September 21, 2004, the circuit court entered an order regarding the lessees' motion for reconsideration, which denied the motion to reconsider and clarify (1) the June 30, 2004 order granting the Church's motion for summary judgment on the issue of nonapplicability of ROH ch. 38 to the Admiral Thomas and (2) the July 8, 2004 order granting in part and denying in part the lessees' motion for partial summary judgment. The order granted the lessees' request for certification pursuant to HRCP Rule 54(b) and directed the entry of final judgment as to the June 30, 2004 and the July 8, 2004 orders. On the same day, the circuit court entered judgment pursuant to HRCP Rule 54(b). Also on September 21, 2004, the circuit court entered a notice of entry of judgment.

On October 14, 2004, the lessees filed a timely notice of appeal. On October 21, 2004, the City filed a timely notice of cross-appeal. On October 27, 2004, the Church filed a timely notice of cross-appeal.

## II. STANDARDS OF REVIEW

### A. Motion For Summary Judgment

We review the circuit court's grant or denial of summary judgment *de novo. Hawai'i Community Federal Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that

entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (citations and internal quotation marks omitted).

*Durette v. Aloha Plastic Recycling, Inc.,* 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004) (quoting *Simmons v. Puu,* 105 Hawai'i 112, 117–18, 94 P.3d 667, 672–73 (2004) (quoting *Kahale v. City and County of Honolulu,* 104 Hawai'i 341, 344, 90 P.3d 233, 236 (2004) (quoting *SCI Management Corp. v. Sims,* 101 Hawai'i 438, 445, 71 P.3d 389, 396 (2003)))).

### B. *Statutory Interpretation*

 We review the circuit court's interpretation of a statute *de novo. State v. Pacheco,* 96 Hawai'i 83, 94, 26 P.3d 572, 583 (2001). Our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

. . . This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993).

*Id.* at 94–95, 26 P.3d at 583–84 (some citations and internal quotation marks added and some in original) (brackets in original).

*Coon v. City and County of Honolulu,* 98 Hawai'i 233, 245, 47 P.3d 348, 360 (2002).

### C. *Constitutional Law*

 "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations, some quotation signals, and some ellipsis points omitted).

## III. *DISCUSSION*

### A. *ROH Ch. 38 Applies To "Mixed–Use" Properties.*

#### 1. *The parties' arguments*

##### a. *The lessees' arguments*

The lessees argue that the circuit court "erroneously legislated new law by finding that the [Admiral Thomas] was a 'mixed use' project and therefore not eligible to utilize the benefits of [ROH ch.] 38" and that "[t]his ruling created a new exception for applicability of [ROH ch.] 38, even though 148 residential units undisputably existed on the property." The lessees further contend that ROH ch. 38 "does not limit its applicability to a project due to other *non*-residential uses that may exist on the same underlying fee simple lands." (Emphasis in original.) The lessees assert that "nowhere in [ROH ch.] 38 does it state that the existence of a non-residential use on the property shall disqualify the entire project and its otherwise qualified residential units." The lessees aver that the declaration of the Admiral Thomas refers to the building as "mixed use" as a descriptive term to identify the purposes of the building. In this connection, the lessees argue, the term "mixed use" has no legal meaning. Fi-

nally, the lessees maintain that the Admiral Thomas was established with 148 residential units and only one specifically non-residential unit, that which expressly described certain new church facilities and an existing sanctuary that were labeled as "Apartment Q." As such, the lessees contend that there is no "genuine dispute that [the Admiral Thomas] is primarily a residential project" created under HRS Chapter 514A as required by ROH ch. 38-1.1.

### b. The City's arguments

The City likewise argues that the circuit court erred in ruling that the inclusion of the words "mixed use" in the Admiral Thomas's condominium declaration provided a basis upon which to disqualify the residential leasehold units from lease-to-fee conversion under ROH ch. 38. The City contends that ROH ch. 38's "applicability is not limited to condominium developments with exclusively residential uses." The City also insists that the "mere fact that Admiral Thomas'[s] condominium documents include the words 'mixed use' is of absolutely no legal significance." The City avers that the Admiral Thomas qualifies for lease-to-fee conversion pursuant to the plain language of ROH ch. 38 and that ROH ch. 38, by its express terms, applies to all condominium property regime developments. The City further argues that ROH ch. 38 "applies to Admiral Thomas because pursuant to the ordinance's two requirements for 'developments': (1) it was created under HRS Chapter 514A and (2) it contains condominium apartment units occupied under apartment leases or condominium conveyance documents."

The City submits that the Church's overliteral reading of the term "residential" as meaning condominium property regimes that are *exclusively* residential "contradicts the legislative intent behind ROH [ch.] 38 and leads to absurd results." The City continues by suggesting that "any landowner would be free to dodge lease-to-fee conversion by merely adding a single non-residential use." The City notes, in support of its position, that ROH § 38-1.2 recognizes that non-residential units may exist on the property, and the City posits that the "mere existence of one of

these non-residential uses clearly does not disqualify the whole development" from condemnation. The City points to this court's language in *Kau v. City and County of Honolulu*, 104 Hawai'i 468, 476 n. 7, 92 P.3d 477, 485 n. 7 (2004), which, in addressing whether a property met the requirements of ROH § 38-1.3, noted that "[a]ll parties agreed that the Property contains residential apartment units." The City alleges, based on the foregoing, that this court "has already refuted [the Church's] strained argument that the term 'residential' requires that every single unit be residential."

Finally, the City propounds that the circuit court erred in legislating and creating an exception for condemnation of the Admiral Thomas because its declaration contains the words "mixed use." The City argues that "[t]his arbitrary distinction improperly creates a new limitation not contemplated by the [City Council]: that a condominium development containing both residential and non-residential units may qualify for lease-to-fee conversion, but not if the words 'mixed use' happen to appear in the condominium documents." The City insists that the circuit court "overstepped its judicial role" by "improperly cresting an additional requirement to the conversion process not contemplated by the City Council[.]"

### c. The Church's arguments

The Church responds by arguing that ROH ch. 38 does not apply to the Admiral Thomas because it is a "mixed use," and not a residential, project. The Church focuses on a detailed explanation that ROH ch. 38 applies only to residential condominium regimes. The Church stresses that ROH § 38-1.3, which pertains to "Applicability," indicates that the entirety of ROH ch. 38 is intended to apply only to residential condominium property regimes because it includes the word "residential" in its purview. The Church counters that the City ignores the more general application of ROH § 38-1.3 in favor of the more specific ROH § 38-2.1, which delineates the applicability of only Article 2 to "condominium property regimes." The Church argues that, pursuant to *In re Water Use Permit Applications*, 94 Hawai'i

97, 151, 9 P.3d 409, 463 (2000), "[w]here [the legislature] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." (Citations omitted). Furthermore, the Church maintains that the City "does not take into account that the definition it relies upon is a subsidiary one (under Article 2), and that the scope of the ordinance is still controlled by the definition of applicability for the *chapter*" found in ROH § 38–1.3. (Emphasis in original.)

The Church responds to the City's reliance on *Kau* for the proposition that not all units in a condominium property regime need be residential by observing that the condominium project in *Kau* was a purely residential building. The Church points out that one-half of its fee land is devoted to non-residential purposes and argues that "[t]here is nothing in Chapter 38 that would support condemning portions of a mixed-use project, a major portion of which is devoted to religious purposes."

In support of its argument that the Admiral Thomas is not a residential condominium project, the Church notes that the Church itself pre-existed the creation of the condominium regime and that it created a residential project "in order to financially support the activities of [the] Church." The Church contends that it is "disingenuous" for the City to argue that the Admiral Thomas is not a mixed use project with a substantial religious use component. The Church urges that the use of the property for religious purposes is not "simply an incidental use, such as a snack shop or restaurant in the first floor of [a] high-rise condominium project."

### 2. *Analysis of ROH ch. 38*

 This court has stated that

[o]ur statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute

itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists . . . .

*Coon,* 98 Hawai'i at 245, 47 P.3d at 360. Moreover, "legislative enactments are presumptively valid and 'should be interpreted [in such a manner as] to give them effect.' " *Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 55, 868 P.2d 1193, 1202 (1994) (quoting *State v. Spencer,* 68 Haw. 622, 624, 725 P.2d 799, 800 (1986) (citation omitted)).

 Three articles in ROH ch. 38 are applicable to the present matter: Article 1, entitled "General Provisions"; Article 2, entitled "Condemnation of Condominium Development Leaseholds"; and Article 5, entitled "Eminent Domain."

> Article 1, § 38–1.3 provides that [ROH ch.] 38 applies to "all lands[ ] in the City and County of Honolulu on which are situated [ ] residential condominium property regime projects created under HRS Chapter 514A. . . ."

> Article 2, § 38–2.1 provides that [condominium property regime] condemnation applies to developments that, at the time of acquisition by the City, are developed into [condominium property regimes] or "occupied by residential lessees under leases of condominium conveyance documents executed before the effective date of this chapter . . . ."

> Article 5, § 38–5.1 provides that eminent domain applies to "developments which are created by condominium property regimes under HRS Chapter 514A. . . ."

*Kau,* 104 Hawai'i at 476, 92 P.3d at 485 (footnotes omitted).

The Church attempts to extricate itself from the purview of ROH ch. 38 by insisting that the chapter applies only to purely residential condominium property regimes and that the Admiral Thomas is *not* such a regime. The Church seemingly argues that because its use of "Apartment Q" is religious in nature, the Admiral Thomas as a whole is

exempt from condemnation. Pursuant to the plain language of ROH ch. 38, the Church is mistaken.

The Church's entire argument is based on the assumption that the Admiral Thomas is *not* residential. In furtherance of its argument, the Church would have this court look exclusively to the language of ROH § 38–1.3, which pertains to "residential condominium property regime projects," and ignore the language of ROH § 38–2.1, which applies to "developments ... [d]eveloped into condominium property regimes," including developments "occupied by residential lessees under leases executed before the effective date of [ROH ch. 38]." The Church appears to consider the fact that the Admiral Thomas has been deemed a "mixed use project" as *sufficient to establish that it is thereby not* "residential."

Pursuant to the Admiral Thomas's declaration, in 1978, the "Lessor and Developer ... submit[ted] their interests in and to the Land and the Project to a Horizontal Property Regime established by [HRS] Chapter 514A." "While Act 180, 1961 Session Laws of Hawaiʻi (Haw.Sess.L.), as amended, originally referred to condominiums as 'horizontal property regimes,' in 1988 the legislature changed the language to 'condominium property regimes' (CPR). 1988 Haw. Sess. L. Act 65 § 2." *Kau*, 104 Hawaiʻi at 471 n. 3, 92 P.3d at 481 n. 3. Condominium means

> *a residential apartment,* together with an appurtenant undivided interest in common elements, located on land subject to a declaration of condominium property regime as defined by HRS Chapter 514A, together with an appurtenant undivided interest in common elements, both used or *occupied, or developed, devoted, intended, or permitted to be used or occupied as a principal place of residence for a single family.*

ROH § 38–1.2 (emphases added). The Admiral Thomas declaration designates a "Residential Tower" consisting of one hundred forty-eight apartments." ROH § 38–1.2 provides that " '[c]ondominium property regime' means a condominium property regime project established under HRS Chapter 514A." ROH § 38–2.2 provides in relevant part that,

> [s]ubject to subsection (b) of this section, *the department may designate all or that portion of a development containing residential condominium land for acquisition,* and facilitate the acquisition of the applicable leased fee interests in that land by the city through the exercise of the power of eminent domain or by purchase under the threat of eminent domain. . . .
>
> . . . .
>
> (b) *This land designated and acquired by the city may consist of a portion of or the entirety of the land area submitted to the declaration of condominium property.*

(Emphases added). ROH § 38–2.2's allowance for the condemnation of "that portion of a development containing residential condominium land" refutes the Church's argument that a project must be purely residential to be condemned under ROH ch. 38.

The applicability of ROH ch. 38 to the Admiral Thomas depends primarily on its qualification as a residential project and on the chapter's express disqualification of certain units from conversion. Based on the foregoing, the Admiral Thomas is properly classified as "residential," inasmuch as (1) it was established under HRS Chapter 514A, (2) it is a condominium property regime, and (3) condominiums are residential units.

The Church's attempt to argue that the Admiral Thomas is not subject to condemnation because it is designated as a "mixed use" building in the declaration is disingenuous. Although this court has not yet had occasion specifically to address the condemnation of "mixed use" buildings, we agree with the lessees and the City that the term "mixed use" is an adjective that has no legal significance as it pertains to the Admiral Thomas's declaration of horizontal property regime. The term "mixed use" appears to be nothing more than a descriptor that seeks to define the purpose, or multiple purposes, of certain property. *See Alford v. City and County of Honolulu,* 109 Hawaiʻi 14, 122 P.3d 809 (2005) ("The Waikiki Shoreline is a fifteen-floor, mixed-use, multi-family dwelling structure located on Waikiki Beach. Presently, the top fourteen floors are residential apartments and the bottom floor is commercial

space."); *Waters v. Cook,* 2005 WL 2864806 (Mass.Land Ct. Nov.2, 2005) ("86 Spring Street is a mixed use building, with its ground floor rented by Julio's Café . . . and its second and third floors divided into apartments."); *L.A. Unified Sch. Dist. v. 3434 So. Grand Ave., LLC,* 2005 WL 2722888 (Cal.Ct. App. Oct.24, 2005) ("South Grand's intended use for the building was a 'mixed use,' including retailing, apparel manufacturing, and 'some sort of' communications.")

### 3. *Conclusion*

ROH ch. 38 applies to "residential condominium property regimes" "within the City and County of Honolulu" created "under HRS Chapter 514A." Notwithstanding the Church's contentions to the contrary, the Admiral Thomas qualifies as a "residential condominium property regime" "within the City and County of Honolulu" that was created "under HRS Chapter 514A." Inasmuch as there is no "doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in [this] statute," *Coon,* 98 Hawai'i at 245, 47 P.3d at 360, no ambiguity exists. Therefore, we hold (1) that ROH ch. 38 does not provide an exception to the condemnation of the Admiral Thomas by virtue of the self-designation as a "mixed use" project contained in its declaration and (2) that the circuit court erred in concluding that ROH ch. 38 was inapplicable to the Admiral Thomas. Accordingly, we reverse the circuit court's June 30, 2004 order ruling that ROH ch. 38 is inapplicable to the Admiral Thomas.

**B.** *The Religious Land Use And Institutionalized Persons Act of 2000 Is Not A Valid Defense To The Condemnation Of The Church's Fee Simple Interest In The Admiral Thomas.*

### 1. *The parties' arguments*

#### a. *The Church's arguments*

The Church argues that the circuit court erred in concluding that RLUIPA does not confer a defense to the condemnation of the Admiral Thomas. The Church contends that there were genuine issues of material fact as to whether the lease-to-fee conversion of Admiral Thomas apartments would violate RLUIPA. The Church avers that the lessees and the City ignored the principal case on point in the matter, *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency,* 218 F.Supp.2d 1203 (C.D.Cal.2002), and alleges that *Cottonwood* "held that a condemnation action is a 'land use regulation' subject to RLUIPA." The Church maintains that *Cottonwood* "pointed to the municipality's zoning system that allowed condemnation in 'blighted' areas" and that, in the present matter, "the City similarly provides a condemnation right to lessees on multi-family residential land as opposed to leasehold lands zoned or developed for other purposes such as industrial, commercial or agricultural use."

The Church also directs this court to the website http://www.becket fund.org/index.php/ case/98.html to view the February 15, 2005 complaint in *Living Faith Ministries v. Camden County Improvement Auth.,* allegedly filed in the United States District Court for the District of New Jersey. The Church claims that the *Living Faith* suit is similar to *Cottonwood* because it "alleges that a municipal agency is violating RLUIPA by attempting to condemn a church's property so that luxury condos can be constructed on the property."

The Church insists that "a government entity's actions must be strictly scrutinized where it involves a 'land use regulation or system of regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments.' " (Quoting 42 U.S.C. § 2000cc(a)(2)(C)). The Church argues that "fundamental rights" are involved in the present matter, requiring that ROH ch. 38 be "analyzed under the 'strict scrutiny' test."

The Church cites a number of cases that were decided under the first amendment and argues that "RLUIPA establishes the same standard." As such, the Church apparently contends that the condemnation of units in the Admiral Thomas would violate its first amendment right to religious free exercise, and that, by extension, RLUIPA operates as a shield against such condemnation. In support of its contention, the Church cites *Keeler v. Mayor and City*

*Council of Cumberland,* 940 F.Supp. 879 (D.Md.1996), and construes it as holding "that a regulatory taking of a church's property" "substantially burdened religious free exercise and was not justified by a compelling governmental interest." The Church observes that the United States Court of Appeals for the Second Circuit, in *Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855, 872 (2d Cir.1988), agreed that "it is well settled that a limitation by the government on the free exercise of religion is permitted only when the state can demonstrate that a compelling interest justifies the restriction and that no alternate means of accomplishing the state's compelling interest are available." The Church also seeks support from *Order of Friars Minor v. Denver Urban Renewal Auth.,* 186 Colo. 367, 527 P.2d 804, 805 (1974) ("Only ... upon finding that there is a substantial public interest involved[,] which cannot be accomplished 'through any other reasonable means,' can the court proceed with the condemnation of the property.") and from 26 Am.Jur.2d *Eminent Domain* § 130 ("Where the property belongs to a religious organization and it is essential to its activities or is unique and of a special religious significance, condemnation has been considered as an interference with the free exercise of religion as protected by the First Amendment.").

The Church argues that the condemnation of leasehold units in the Admiral Thomas "would substantially burden the ability of [the] Church to carry on its religious activities." It notes that upon termination of the residential leaseholds, the units would revert to the Church, thereby enabling it to determine whether to use the property for religious purposes. The Church complains that condemnation will "deprive" it of its "future ability to use the property," inasmuch as there is "no present ability ... to expand or redesign its sanctuary and administrative building." The Church further fears that "continued application of this law will eventually work to force [it] out of its property entirely." Finally, the Church requests "the opportunity to prove at trial that the City's actions have violated RLUIPA," arguing that it is especially important "in a case of first impression."

b. *The City's arguments*

The City argues that a "party challenging a government regulation under RLUIPA must prove that the regulation 'substantially burdens its exercise of religion' " and that RLUIPA is not implicated in the present matter because the Church's exercise of religion is unaffected. The City maintains that leasehold conversion will only affect portions of the Church's property already committed to non-religious activities, to wit, residential condominium apartments. Furthermore, the City contends that "RLUIPA limits the power of governments to enact or implement *land use regulations* to exclude the use of property for religious purposes," (emphasis in original), and that ROH ch. 38 as applied is not a "land use regulation."

The City cites *Omnipoint Communications, Inc. v. City of White Plains,* 202 F.R.D. 402 (S.D.N.Y.2001), in support of its argument that "RLUIPA was enacted to prevent discriminatory treatment of religious entities in the enactment and implementation of land use regulations." *Omnipoint* stated that RLUIPA "was passed because Congress found that churches were 'frequently discriminated against' where zoning codes 'frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes.' " 202 F.R.D. at 403.

The City argues that its application of ROH ch. 38 to the Admiral Thomas

clearly does not violate RLUIPA because[:] (1) ROH [ch.] 38 conversion does not constitute a "land use regulation" and therefore is not subject to RLUIPA; (2) collecting leasehold rent from lessees in a residential condominium building does not constitute a "religious exercise"; and (3) no substantial burden on religious exercise exists as ROH [ch.] 38 does not prevent [the Church]'s continued use of its property as a church.

(1) *The City's argument that ROH ch. 38 is not a land use regulation*

The City argues that RLUIPA "expressly limits its application to land use regulations"

in accordance with 42 U.S.C. § 2000cc(a)(1), which states that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on religious exercise of a person, including a religious assembly or institution." Quoting 42 U.S.C. § 2000cc–5(5), the City notes that the "statute narrowly defines 'land use regulation' as either a zoning or landmarking law" as follows:

The term "land use regulation" means a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

Based on the foregoing, the City argues that it is "impossible to construe ROH [ch.] 38 as a zoning or landmarking law, as it has nothing to do with 'legislative division of a region' or 'a historically significant building or site,' " the terms' respective common definitions. (Quoting Black's Law Dictionary (7th ed.1999).)

The City declares the Church's reliance on *Cottonwood* "irrelevant" to the present matter because "the property interests that are to be condemned pursuant to ROH [ch.] 38 [are] not religious." Accordingly, the City argues, RLUIPA is inapplicable to the condemnation proceedings against residential condominium units in the Admiral Thomas.

### (2) *The City's argument that collecting leasehold rent does not constitute religious exercise*

The City asserts that the legislative history of RLUIPA "clearly establishes that government regulations affecting a church's ability to collect rent place *no* burden on religious exercise." (Emphasis in original.) The City emphasizes that such legislative history indicates that "the rule excluding commercial activity from 'religious exercise' applies with equal force where the religious and secular activities take place on different parts of the same property." In the present matter, according to the City, ROH ch. 38 "lease-to-fee conversion would only affect portions of the property that [the Church] has committed to non-religious activities, *i.e.*, residential condominium apartments." Furthermore, the City contends that the "fact that lease rents may be used to support religious activities does not convert this secular activity into a religious exercise" and that any interpretation to the contrary "would allow religious entities to engage in all manner of commercial activities and claim protection for religious exercise."

### (3) *The City's argument that ROH ch. 38 does not require individualized assessments*

The City argues that the scope of RLUIPA is narrowly directed at three expressly defined means by which a substantial burden is imposed on religious exercise, only one of which applies to the present matter and requires the government to make "individualized assessments of the proposed uses for the property involved." (Quoting 42 U.S.C. § 2000cc(a)(2)(C).) As such, the City argues, RLUIPA does not assist the Church because ROH ch. 38 does not permit such individualized assessments. The City maintains that ROH ch. 38 contains no mechanism for official discretion with regard to who is petitioning or in which building the relevant leasehold units are located. Citing ROH § 38–2.2(a)(1), the City notes that "[t]he criteria evaluated to determine if the City may designate all or a portion of a development for acquisition include a determination of whether there is a sufficient number of lessees applying for conversion." "Whether the lessee qualifies to purchase is an equally objective determination, as defined by the statute, and does not lend itself to individualized assessments," thus making ROH ch. 38 "a law of general applicability" and RLUIPA inapplicable, according to the City.

### (4) *The City's argument that ROH ch. 38 does not create a "substantial burden" on the Church's religious activities*

Furthermore, the City avers, the Church is unable to demonstrate that lease-to-fee conversion of Admiral Thomas's residential condominium units would impose a "substantial burden" on the Church's religious exercise,

which is required to establish a violation of RLUIPA. The City again cites to the legislative history underlying RLUIPA for the proposition that the application of ROH ch. 38 to the Admiral Thomas does not impose a substantial burden on religious exercise, noting that "a burden on a commercial building, which is connected to religious exercise primarily by the fact that proceeds from the building's operation would be used to support religious exercise, is not a substantial burden on 'religious exercise.' " (Quoting 146 Cong. Rec. S7776 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy).) Inasmuch as only the Church's ability to collect lease rent would be affected by conversion under ROH ch. 38, the City asserts that the Church's exercise of religion is not substantially burdened.

### c. The lessees' arguments

Similar to the City, the lessees argue that RLUIPA is a zoning act and that it does not apply to the facts of the present condemnation suit. They claim that the Church is seeking special treatment and an exemption from the purview of ROH ch. 38.

The lessees argue that RLUIPA is "aimed at prohibiting local government from using its zoning powers to substantially impair the right of churches to carry on religious activities" and that it does not "apply to generalized condominium condemnation regulations that are *applied equally* to all condominium projects." (Emphasis in original.) Moreover, the lessees maintain, the condemnation of leasehold units in the Admiral Thomas "does not infringe in any manner, let alone 'substantially,' on the ability of the Church to carry on its religious activities."

### 2. Analysis of RLUIPA and relevant case law

■ Congress enacted RLUIPA in 2000 in response to the United States Supreme

Court's decision in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which held that the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, exceeded the scope of Congress's enforcement powers under section 5 of the fourteenth amendment to the United States Constitution. Congress sought to define the scope and extent of the first amendment's Free Exercise Clause through RLUIPA, which prescribes a strict scrutiny standard of review in land use cases. In particular, as noted *supra* at note 3, RLUIPA prohibits governments from imposing or implementing

> a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>> (A) is in furtherance of a compelling governmental interest; and
>> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).[7]

"Congress enacted RFRA in direct response to the [Supreme] Court's decision in *Employment Div. Dept. of Human Res[.] of Or[.] v. Smith*, 494 U.S. 872[, 110 S.Ct. 1595, 108 L.Ed.2d 876] ... (1990)." *City of Boerne*, 521 U.S. at 512[, 117 S.Ct. 2157]. As the Supreme Court elucidated in *City of Boerne*, the *Smith* Court

> considered a Free Exercise Clause claim brought by members of the Native American Church who were denied unemployment benefits when they lost their jobs because they had used peyote. Their practice was to ingest peyote for sacramental purposes, and they challenged an Oregon statute of general applicability which made use of the drug criminal. In

7. The lessees impliedly challenge the constitutionality of RLUIPA in their answering brief, but do not raise it as a point of error on appeal. Therefore, we do not address the constitutionality of RLUIPA. In any event, inasmuch as we ultimately hold that the circuit court did not err in concluding that RLUIPA was unavailable as a defense in the present matter, we would refrain

from addressing the question of RLUIPA's constitutionality. *See Lyng v. NW Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

evaluating the claim, we declined to apply the balancing test set forth in *Sherbert v. Verner*, 374 U.S. 398[, 83 S.Ct. 1790, 10 L.Ed.2d 965] ... (1963), under which we would have asked whether Oregon's prohibition substantially burdened a religious practice and, if it did, whether the burden was justified by a compelling government interest. We stated:

> "[The] government's ability to enforce generally applicable prohibitions of socially harmful conduct ... cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development. To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling' ... contradicts both constitutional tradition and common sense." 494 U.S.[ ] at 885[, 110 S.Ct. 1595] ... (internal quotation marks and citations omitted).

The application of the *Sherbert* test, the *Smith* decision explained, would have produced an anomaly in the law, a constitutional right to ignore neutral laws of general applicability. The anomaly would have been accentuated, the Court reasoned, by the difficulty of determining whether a particular practice was central to an individual's religion. We explained, moreover, that it "is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." 494 U.S.[ ] at 887[, 110 S.Ct. 1595] ... (internal quotation marks and citation omitted).

*City of Boerne*, 521 U.S. at 512–13, 117 S.Ct. 2157.

In July 2000, Senators Orrin Hatch (R–Utah) and Edward Kennedy (D–Mass.) introduced RLUIPA in the Senate and, upon gaining bipartisan support, the statute passed unanimously in both houses Congress and was signed by President Clinton on September 22, 2000.

> The jurisdictional underpinning for RLUIPA is distinct from RFRA. First, RLUIPA only covers state action aimed at land use decisions and persons in jails or mental facilities. 42 U.S.C. §§ 2000cc [to] 2000cc–1. Second, application of RLUIPA is limited to cases that affect federally financed programs, interstate and foreign commerce, or cases where the land use decisions are part of a system of "individualized assessments." [*Id.*] § 2000cc(a)(2). By limiting RLUIPA in this way, Congress has acted primarily pursuant to its power under the Spending and Commerce Clauses, U.S. Const. art. I, § 8, cls. 1, 3. Only application of RLUIPA to "land use regulation[s] or system[s] of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments" comes under the rubric of Congress's authority under the Enforcement Clause of the Fourteenth Amendment. 42 U.S.C. § 2000cc(a)(2)(C). To the extent that RLUIPA is enacted under the Enforcement Clause, it merely codifies numerous precedents holding that systems of individualized assessments, as opposed to generally applicable laws, are subject to strict scrutiny.

*Cottonwood*, 218 F.Supp.2d at 1220–21.

As a preliminary matter, we note that the interpretation of RLUIPA as applied to ROH ch. 38 is a question of first impression in this court. More broadly, this court has never had occasion to address the provisions of RLUIPA in any context.

RLUIPA, by its terms, prohibits a governments' imposition or implementation of "a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution." 42 U.S.C. § 2000cc(a)(1).

RLUIPA defines a "land use regulation" as

> a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

*Id.* § 2000cc–5(5). Under this definition, a government agency implements a "land use regulation" only when it acts pursuant to a "zoning or landmarking law" that limits the manner in which a claimant may develop or use property in which the claimant has an interest. Nevertheless, RLUIPA "does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination or unfair delay." 146 Cong. Rec. at S7776 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy) [hereinafter, "Joint Statement"].

Thus, as a threshold matter, "[t]he applicability of RLUIPA in the present matter ... turns on whether the City acted pursuant to a zoning or landmarking law," *Prater v. City of Burnside*, 289 F.3d 417, 434 (6th Cir.2002), when it sought to condemn certain units of the Admiral Thomas pursuant to ROH ch. 38.

A "landmark" is defined as "[a] feature of the land, monument, marker, or other erection set up on the boundary line of two adjoining estates" or as a "[b]uilding or site having historical significance." *Black's Law Dictionary* 879 (6th ed.1990). The definition further notes that "[t]he removing of a landmark is a wrong for which an action lies." *Id.* "Zoning" is defined as "[t]he division of a city or town by legislative regulation into districts and the prescription and application in each district of regulations having to do with structural and architectural designs of buildings and of regulations prescribing use to which buildings within designated districts may be put." *Id.* at 1618. "Zoning" is also the "[d]ivision of land into zones, and within those zones, regulation of both the nature of land usage and the physical dimensions of uses including height setbacks and minimum area." *Id.* Therefore, a "zoning or landmarking law" as defined by RLUIPA must pertain either (1) to the division of a city into districts and the regulation of the land usage within those districts or (2) to a monument, marker, or building having historical significance. ROH § 38–1.1 establishes "the right of any person, who is a lessee under any long-term lease of land upon which is situat-

ed ... residential condominium property regime projects created under HRS Chapter 514A ... to purchase at a fair and reasonable price the fee simple title to such land." On its face, therefore, ROH ch. 38 is not concerned with either zoning or landmarking.

In *Prater*, the fact that the city had already acquired an interest in the property at issue gave it the right to choose the property's fate and was "thus not based upon any zoning or landmarking law restricting development or use of the Church's own private property." 289 F.3d at 434. As such, the United States Court of Appeals for the Sixth Circuit held that no jurisdictional basis existed for the church's RLUIPA claim. *Id.*

The United States District Court for the Northern District of Illinois recently held that Chicago's proposed expansion of O'Hare airport did not implicate RLUIPA because, *inter alia*, the city's authority to acquire the land did not stem from a zoning regulation or landmarking law. *St. John's United Church of Christ v. City of Chicago*, 401 F.Supp.2d 887, 899 (N.D.Ill.2005).

> RLUIPA only applies to government actions that "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person." 42 U.S.C. § 2000cc. The term "land use regulation" is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land...." 42 U.S.C. § 2000cc–5(5). *In this case the City is seeking to exercise eminent domain power. Nothing in the ... complaint leads to the inference that the City's authority to acquire the land stems from any zoning regulations or landmarking law.*

*Id.* (emphasis added).

In *Faith Temple Church v. Town of Brighton*, 405 F.Supp.2d 250 (W.D.N.Y.2005), the United States District Court for the Western District of New York held that a town's eminent domain proceedings did not constitute a "land use regulations" for purposes of RLUIPA.

> Faith Temple does not appear to contend ... that the Town's condemnation

of the Groos parcel would involve a "landmarking law." Landmarking laws generally involve the "regulat[ion] and restrict[ion of] certain areas as national historic landmarks, special historic sites, places and buildings for the purpose of conservation, protection, enhancement and perpetuation of these places of natural heritage." Nothing of that nature is involved here.

The eminent domain proceedings here also do not amount to a "zoning law" or "the application of such a law."

. . . .

Given these differences between zoning and eminent domain, it seems very unlikely that Congress assumed that courts would interpret RLUIPA's reference to zoning laws as including eminent domain proceedings as well. The simple fact is that Congress chose to limit the application of RLUIPA to cases involving "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land . . . ." Conspicuously absent is any mention of eminent domain. Eminent domain is hardly an arcane or little-known concept, and

the Court will not assume that Congress simply overlooked it when drafting RLUIPA.

*Id.* at 254–55 (citation omitted).

In the only case to challenge Hawaii's land use laws and claim RLUIPA as a bar to their enforcement, *Hale O Kaula Church v. Maui Planning Comm'n,* 229 F.Supp.2d 1056 (D.Haw.2002), the United States District Court for the District of Hawai'i held, *inter alia,* that Hawai'i statutes governing special use permits were facially valid "land use regulations" in the context of RLUIPA. The plaintiffs argued that the county's denial of a special use permit to expand their facility and hold religious services along with Hawaii's land use law violated the "equal terms" and "nondiscrimination" provisions of RLUIPA, which state that "[n]o government shall impose or implement a land use regulation that" either "treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution" or "discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(1)-(2). The court found that HRS §§ 205–4.5 (1993 & Supp.1998) [8] and 205–6 (1993 & Supp.

---

8. HRS § 205–4.5 provides in relevant part:

**Permissible uses within the agricultural districts.** (a) Within the agricultural district all lands with soil classified by the land study bureau's detailed land classification as overall (master) productivity rating class A or B shall be restricted to the following permitted uses:

(1) Cultivation of crops, including but not limited to flowers, vegetables, foliage, fruits, forage, and timber;

(2) Game and fish propagation;

(3) Raising of livestock, including but not limited to poultry, bees, fish, or other animal or aquatic life that are propagated for economic or personal use;

(4) Farm dwellings, employee housing, farm buildings, or activity or uses related to farming and animal husbandry;

Farm dwelling as used in this paragraph means a single-family dwelling located on and used in connection with a farm, including clusters of single-family farm dwellings permitted within agricultural parks developed by the State, or where agricultural activity provides income to the family occupying the dwelling;

(5) Public institutions and buildings which are necessary for agricultural practices;

(6) Public and private open area types of recreational uses including day camps, pic-

nic grounds, parks, and riding stables, but not including dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps;

(7) Public, private, and quasi-public utility lines and roadways, transformer stations, communications equipment buildings, solid waste transfer stations, major water storage tanks, and appurtenant small buildings such as booster pumping stations, but not including offices or yards for equipment, material, vehicle storage, repair or maintenance, or treatment plants, or corporation yards, or other like structures;

(8) Retention, restoration, rehabilitation, or improvement of buildings or sites of historic or scenic interest;

(9) Roadside stands for the sale of agricultural products grown on the premises;

(10) Buildings and uses, including but not limited to mills, storage, and processing facilities, maintenance facilities, and vehicle and equipment storage areas that are normally considered directly accessory to the abovementioned uses and are permitted under [HRS § ] 205–2(d);

(11) Agricultural parks; or

(12) Wind energy facilities, including the appurtenances associated with the production and transmission of wind generated energy;

1998)[9] are "land use regulations" for purposes of RLUIPA, despite Maui County's contention that because the state land use classification system, and not county zoning codes, were at issue, a "land use regulation" was not involved. *Hale O Kaula*, 229 F.Supp.2d at 1070. The court rejected the church's argument that "merely having to obtain a permit is a violation of federal law" by concluding that the statutory provisions "do not facially discriminate against religious institutions" and that "classifying land into agricultural, rural, urban, and conservation districts does not discriminate against church buildings or uses." *Id.* The court further concluded that the "law is facially neutral and of general applicability," which did not treat the church "on less than equal terms with a nonreligious assembly or institution," and that "[t]o rule otherwise would exempt religious institutions from all zoning laws," which "clearly was not the intent of RLUIPA." *Id.* at 1070–71.

The court's designation of HRS §§ 205–4.5 and 205–6 as "land use regulations" within the meaning of RLUIPA in *Hale O Kaula* can easily be distinguished from ROH ch. 38, at issue in the present matter. HRS §§ 205–4.5 and 205–6, *see supra* notes 8 and 9, by their plain language, involve the "division of land into zones" and "the regulation of [ ] the nature of land usage" within those zones. Indeed HRS § 205–5, housed in the same chapter, is entitled "Zoning" and describes appropriate land uses within agricultural districts. Furthermore, the above-quoted sec-

tion (b) provisions of RLUIPA that were the basis for the church's claim in *Hale O Kaula* are not at issue in the present matter.

Finally, the Church's reliance on *Cottonwood* is misguided. In *Cottonwood*, a church sued the city for denial of land use permits to allow it to build a church facility on land it owned and sought to preliminarily enjoin the city from continuing eminent domain proceedings to condemn the land for use as commercial retail space. 218 F.Supp.2d at 1209. The question at issue in *Cottonwood* was whether the city's actions should be subject to strict scrutiny, and the court subsequently applied the strict scrutiny standard "because the [c]ity's refusal to grant Cottonwood its application for a [conditional use permit] involves a 'land use regulation or system of regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments." 218 F.Supp.2d at 1222 (quoting 42 U.S.C. § 2000cc(a)(2)(C)). *Cottonwood* did not hold, as the Church contends, that "a condemnation action is a 'land use regulation' subject to RLUIPA." Following its explanation of the applicability of the strict scrutiny standard, the court noted:

> Defendants argue that RLUIPA does not apply because the exercise of eminent domain is not a "land use regulation" under RLUIPA.... Moreover, Defendants insist that only the condemnation proceedings

provided that such facilities and appurtenances are compatible with agriculture uses and cause minimal adverse impact on agricultural land.

(b) Uses not expressly permitted in subsection (a) shall be prohibited, except the uses permitted as provided in [HRS §§ ] 205–6 and 205–8 [ (regarding nonconforming uses).]

9. HRS § 205–6 provides in relevant part:

**Special permit.** (a) The county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified. Any person who desires to use the person's land within an agricultural or rural district other than for an agricultural or rural use, as the case may be, may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired. Each county may establish the appro-

priate fee for processing the special permit petition.

. . . .

(c) The county planning commission may under such protective restrictions as may be deemed necessary, permit the desired use, but only when the use would promote the effectiveness and objectives of this chapter. A decision in favor of the applicant shall require a majority vote of the total membership of the county planning commission.

(d) Special permits for land the area of which is greater than fifteen acres shall be subject to approval by the land use commission. The land use commission may impose additional restrictions as may be necessary or appropriate in granting such approval, including the adherence to representations made by the applicant.

are at issue in this motion, a position with which the Court has already disagreed. Even if the Court were only considering the condemnation proceedings, they would fall under RLUIPA's definition of "land use regulation" which is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts the claimant's use or development of land ..." 42 U.S.C. § 2000cc–5(5). *The Redevelopment Agency's authority to exercise eminent domain to contravene blight, as set forth in the Resolution of Necessity, is based on a zoning system developed by the City (the LART Plan). It would unquestionably "limit[ ] or restrict [ ]" Cottonwood's "use or development of land."*

218 F.Supp.2d at 1222 n. 9 (emphasis added) (some ellipses added, some in original). The fact that the *Cottonwood* court denominated the authority of the Cypress, California Redevelopment Agency to exercise its power of eminent domain as being "based on a zoning system" has no bearing on the present matter. The Redevelopment Agency's authority apparently emanated from "the Resolution of Necessity" and a zoning system developed by that city, which by no means signifies that *all* exercises of eminent domain are grounded in a zoning system. As such, the court's analysis in *Cottonwood* does not affect this court's interpretation of ROH ch. 38. *See St. John's United Church of Christ*, 401 F.Supp.2d at 899–900 (holding that *Cottonwood* does not stand for the proposition that all exercises of eminent domain authority are subject to RLUIPA; "that case can be read to suggest that RLUIPA is applicable to the specific eminent domain actions where the condemnation proceeding is intertwined with other actions by the city involving zoning regulations").

Furthermore, the Church's contention that the condemnation powers conferred under ROH ch. 38 apply only to "lessees on multi-family residential land as opposed to leasehold lands zoned or developed for other purposes such as industrial, commercial or agricultural use" is incorrect. The "condemnation right" under ROH ch. 38 derives from the fact that a person is a lessee "under any long-term lease of land upon which is situated [ ] residential condominium property regime projects." ROH § 38–1.1. A condemnation right, standing alone, is not a "zoning law," and the self-evident fact that ROH ch. 38 applies to buildings that happen to be situated on land zoned to permit residences does not alter that reality.

A plain reading of RLUIPA compels the conclusion that the application[ ] of ROH ch. 38 to qualified units of the Admiral Thomas condominium complex does not violate RLUIPA. Because ROH ch. 38 is neither a zoning nor a landmarking law, it does not constitute a "land use regulation" pursuant to the RLUIPA definition of that term. Inasmuch as we hold that ROH ch. 38 is not a "landmarking law," we need not determine whether its application imposes a "substantial burden" on the Church's religious exercise, involved an "individualized assessment," or is a least-restrictive compelling interest.

Therefore, we hold that the circuit court did not err in concluding that RLUIPA was unavailable to the Church as a defense to the condemnation of its fee simple interests in qualified Admiral Thomas residential condominium units. We thus affirm the circuit court's July 8, 2004 grant of summary judgment on the issue of the inapplicability of RLUIPA to the present matter.

C. *There Are Genuine Issues Of Material Fact As To Whether A Minimum Of Twenty–Five Leasehold Applicant Units Exist To Qualify For Conversion To Fee Simple Under ROH § 38–2.2.*

1. *The parties' arguments*

a. *The lessees' arguments*

The lessees argue that the circuit court erred in concluding that there were not qualified applicants for at least twenty-five leasehold units.[10] The lessees seek to clarify that "the 28 qualified applicant[ ] [units] should be construed only as a preliminary triggering

---

10. The City did not address the number of qualified Admiral Thomas lessees or units in its opening brief.

number to initiate the conversion and designation approvals at the City Council." The lessees contend that they only need twenty-five qualified applicant units to trigger condemnation proceedings and that "if the number ever dips below 25 for any reason, such as death [or] inheritance, [ ] that should not disqualify all of the other remaining applicants from continuing with the condemnation process." The lessees maintain that "at least a minimum of 25 qualified applicant[ ] [units] have existed since designation by the City." They insist that "there are two separate triggering points" in this case—the first when the Admiral Thomas was initially designated on October 11, 2002 and then when the amended and supplemental designation was filed on March 20, 2003. The lessees argue that because the six new applicant units were added on March 20, 2003, that they constituted part of the qualifying total twenty-five units, such that "even subtracting the disputed [three] disqualifications, the minimum

number of qualified applicant units never dipped below [twenty-five] after the amended designation."

The lessees further argue that ROH § 38–2.4,[11] entitled "Qualifications for purchase," allows for applicants to qualify at the time of *sale* rather than the time that their applications are preliminarily approved by the City. They contend that "[t]here is no rule that says that if the applicant does not meet the technical requirements at any time before '*sale*,' that they would be disqualified." (Emphasis in original.) The lessees construe ROH § 38–2.2(a)(1)[12] to mean that applicants are "deemed to 'apply' to [the DCS] when they 'file an application with the department" and that "the department then *preliminarily approves* the applicants." (Emphasis in original.)

The lessees seek to reverse the circuit court's disqualification of applicant-lessees George and JoAnn Lumsden (Unit 2901), Neil Bellinger (Unit PH–1), and Myrna

11. ROH § 38–2.4 provides in relevant part:
 (a) No sale of any condominium land within a development shall be made unless the lessees:
 (1) Are at least 18 years of age and are owner-occupants of their condominium units;
 (2) Are bona fide residents of the City and County of Honolulu;
 (3) Have legal title to, or pursuant to an agreement of sale, have an equitable interest in a condominium situated on the leased property applied for ... [; and]
 (4) Do not own property in fee simple lands suitable for residential purposes within the City and County of Honolulu[.] ... A person is deemed to own lands, for the purpose of this paragraph, if the person, the person's spouse, or both the person and the person's spouse (unless separated and living apart under a decree of a court of competent jurisdiction) own lands, including any interest, in a land trust in the City and County of Honolulu;
 (5) Submit a letter of credit, certificate of deposit, proof of funds, or approved application from any lending institution demonstrating that the lessees who are participating in the purchase of the fee interest will be able to pay the city promptly for the leased fee interests;
 (6) Submit an application for the purchase of the leased fee interest in good faith, and in such form as is acceptable to the department; and
 (7) Execute a contract for the purchase of the fee interest in good faith, and in such form as is acceptable to the department[.]

12. ROH § 38–2.2 provides in relevant part:

 (a) Subject to subsection (b) of this section, the department may designate all or that portion of a development containing residential condominium land for acquisition, and facilitate the acquisition of the applicable leased fee interests in that land by the city through the exercise of the power of eminent domain or by purchase under threat of eminent domain, after:
 (1) At least 25 of all the condominium owners within the development or at least owners of 50 percent of the condominium units, whichever number is less, apply to the department to purchase the leased fee interest pursuant to Section 38–2.4, and file an application with the department; and
 (2) Due notice is given and a public hearing held [and] the department finds that the acquisition of the leased fee interest in the development or a portion thereof, through exercise of the power of eminent domain or by purchase under threat of eminent domain and the disposition thereof as provided in this part, will effectuate the public purposes of this chapter. For purposes of this subsection, "condominium owners" means the owner-occupants of the condominium development.
 (b) This land designated and acquired by the city may consist of a portion of or the entirety of the land area submitted to the declaration of condominium property.

Chun–Hoon (Unit 801) because they claim that the circuit court based its decision "upon a determination that if an applicant *ever owned* other fee simple property on Oahu *at any time* prior to the time the applications were *filed,* then [the] applicants would be disqualified." (Emphases in original.) The lessees maintain that "[n]o language in [ROH ch.] 38 supports this interpretation and application of the qualification criteria."

### (1) *Applicants George and JoAnn Lumsden*

The lessees explain that the Lumsdens bought their Admiral Thomas unit in 1982, signed their application for ROH ch. 38 leasehold conversion on August 31, 1995, and did not own any other fee simple property on Oʻahu at that time. The lessees contend that Mr. Lumsden inherited a studio condominium apartment from his mother in September 1997 and sold it in December 1997. The Lumsdens' application was filed with the City on November 1, 2000 "because it took several years to assemble the minimum pool of [twenty-five] applicant[-]owners in order to be submitted as a group that could qualify to trigger the designation." The lessees note that, "[i]mportantly, at the time they filed their application with the City, the Lumsdens did not own any other fee simple property suitable for residential purposes." The lessees argue that "[n]either [ROH ch.] 38 nor the [Amended Rules for Residential Condominium, Cooperative and Planned Development Leasehold Conversion [hereinafter, 'DCS Rules']] expressly provide for disqualification of an applicant who may have *at one time in the past* owned fee simple lands." (Emphasis in original.) The lessees contend that the Lumsdens' application and affidavit were "both entirely true and accurate when they were originally *signed* " on August 31, 1995 and also when "they were *filed* with DCS on November 1, 2000." (Emphases in original.) As a result, the lessees argue that the circuit court erred in disqualifying the Lumsdens for only temporarily holding title to a fee simple property in the intervening period between signing the application and filing it.

### (2) *Applicant Neil Bellinger*

The lessees argue that Bellinger also qualified to purchase the fee simple interest in his Admiral Thomas unit at the time his application was filed with the City. They contend that since Bellinger sold his fee simple title to a condominium at the Royal Iolani between the date that he signed his application on May 13, 1998 and when he filed the application with the DCS on November 1, 2000, the circuit court should not have disqualified his unit from the original pool of applicants. The lessees maintain that because Bellinger "did not own any other fee simple lands suitable for residential purposes, as expressly stated in ROH § 38–2.4(4)," *see supra* note 11, at the time he filed his application, his unit qualified for leasehold conversion.

### (3) *Applicant Myrna Chun–Hoon*

The lessees aver that Chun–Hoon's unit also qualified for leasehold conversion because she did not own any other fee simple lands at the time that her application was filed with DCS. The lessees explain that Chun–Hoon inherited from her mother undivided interests in three parcels of fee simple property on Oʻahu, all of which she sold prior to signing her application on May 6, 2002. Furthermore, the lessees argue, Chun–Hoon did not own any fee simple lands when her application was filed with DCS on May 13, 2002.

Based on the foregoing, the lessees contend that it is the filing date of the application "that should control the issue of preliminary qualification" and that each of the disqualified lessees "had conveyed away any interest in other property *prior to filing* their application[s]," such that the circuit court erred in disqualifying them. (Emphasis in original.)

Finally, the lessees construe ROH 38–2.4(a)(4), *see supra* note 11, to mean that a lessee may not own fee simple property at the time that the condominium land is sold, but that it does not disqualify a lessee who owned fee simple property in the past. The lessees conclude that "[a] clear reading of the DCS rules and ROH § 38–2.4(a)[ ] simply requires the applicants to be preliminarily

qualified as of their application filing date and to be fully qualified by the time of *sale.*" (Emphasis in original.)

### b. The Church's arguments

The Church argues that the lessees have failed to demonstrate that they maintained twenty-five qualified applicant units. The Church avers that "case law indicates that once there are less than 25 qualified lessees, public purpose ceases and the condemnation must be terminated." The Church also contends that *Housing Finance and Devel. Corp. v. Takabuki,* 82 Hawai'i 172, 921 P.2d 92 (1996) [*Takabuki II* ], held that the class of original applicants must be continuously maintained throughout the condemnation in order for it to proceed. The Church cites this court's decision in *Coon,* 98 Hawai'i at 250, 47 P.3d at 365, to show that the public purpose of ROH ch. 38 is not served if the requisite number of at least twenty-five units is not obtained to convert to fee simple. The Church also submits that the City attempted to "add new units and lessees after the twelve-month period expired[,] despite the fact that the designation was stale" and did not comply with the notification requirements of ROH ch. 38 or *Coon.*[13]

The Church argues that it showed that multiple lessees had owned disqualifying fee simple land after the dates their applications were signed but otherwise fails to articulate a response to the lessees' argument that the *filing* date of a lessee's application with DCS is the controlling date for the determination of eligibility for leasehold conversion. The Church asserts that "ROH ch. 38 is not intended to be a welfare program for the wealthy" and argues that the lessees could create "a 'false poverty' simply to qualify for a government administered program," which the Church calls "particularly egregious when the attempted dispossession for the wealthy is from a church [that] is providing

social assistance to the homeless, poor and needy in our community."

### 2. Analysis of the applicable law

■■■ "As a general proposition, summary judgment should be granted where there is no genuine issue as to any material fact and one party is entitled to a judgment as a matter of law." HRCP Rule 56(b)(c); *Querubin v. Thronas,* 107 Hawai'i 48, 57, 109 P.3d 689, 698 (2005). Therefore, the relevant inquiry is whether, in the absence of any genuine issue of material fact, the circuit court's conclusion that there were not qualified applicants for at least twenty-five units to acquire the fee simple title to the land was correct.

### (a) Whether the City added units after the twelve-month period beginning at designation

On October 11, 2002, the Director of the DCS designated a portion of the Admiral Thomas for acquisition, specifically including the interests of twenty-eight residential condominium units.

On March 20, 2003, the Director of the DCS amended the designation of the Admiral Thomas to include the acquisition of the leased fee interests appurtenant to six additional units that met the applicable requirements of ROH ch. 38. The Director was permitted to amend the designation and add qualified units pursuant to DCS Rules § 2–11(d) (2000), which provides in relevant part that

[a]ny owner occupant of a condominium in the development who was not one of the applicants at the time of the designation of the individual residential condominium interests may apply and become an additional applicant, subject to meeting the appli-

---

13. Other than summarily stating that "the additional units … never complied with the public notice and hearing requirement of ROH § 38–3.2(a)(2) and *Coon,*" the Church fails to support its argument with citations to the record. We note that the Church likely meant to cite to ROH § 38–2.2(a)(2), *see supra* note 12, which pertains to the condemnation of condominium development leaseholds under Article 2 rather than ROH

§ 38–3.2(a)(2), which pertains to the condemnation of cooperative housing development leaseholds under Article 3. Because the Church's claim lacks any support or elaboration, we do not address the contention that the addition of units in an amended designation did not comply with the public notice and hearing requirement of ROH ch. 38.

cable requirements of [ROH ch. 38] and these rules.

On May 8, 2003, the City filed a complaint in eminent domain. Contrary to the Church's assertion that, pursuant to *Coon,* "after twelve months, a designation becomes 'stale' and of no further force and effect" and that "the City added new units well after the 12–month limit," *Coon* does not require the City to add newly approved units within twelve months of the original designation date. Rather, *Coon* mandates that the City initiate a condemnation action within twelve months of designating the property for acquisition. 98 Hawai'i at 255, 47 P.3d at 370. In the present matter, the City both initiated a condemnation action and "added new units" within twelve months of its October 11, 2002 designation of the Admiral Thomas. Therefore, the City did not violate the rule in *Coon* regarding the timely initiation of a condemnation action, nor, without more, did it improperly add units to the original designation.

### (b) *Whether the requirement of twenty-five units is only to trigger condemnation proceedings*

The lessees contend that, in order to comply with ROH § 38–2.2, they only need twenty-five units, presumably qualified or not, to "trigger" condemnation proceedings, and that, in the present matter, there were two separate triggering dates—October 11, 2002, when the Admiral Thomas was initially designated, and March 20, 2003, when the amended designation was filed. Essentially, the lessees posit that they can make up for any deficiency in the initial requirement of twenty-five units at the outset if they properly add more qualifying units later. Based on this court's previous case law interpreting ROH § 38–2.2, the lessees are wrong in this regard.

This court recently addressed the argument that "ROH chapter 38 does not require that the statutory minimum number of applicants be maintained only from the [appli-

cants] originally designated" in *City and County of Honolulu v. Hsiung,* 109 Hawai'i 159, 177, 124 P.3d 434, 452 (2005) (brackets in original). "This court has ruled that the failure to receive a sufficient number of qualified applications prior to initiating ROH chapter 38 proceedings results in an invalid, void, and unenforceable designation because the department exceeded its authority pursuant to ROH § 38–2.2." *Id.* at 178, 124 P.3d at 453. In *City and County of Honolulu v. Ing,* this court held that "the circuit court … erred in deciding that the use for which The Kahala Beach [condominiums] is sought to be condemned is a public use within the meaning of HRS ch. 101 and ROH ch. 38" because "the City did not receive applications for lease-to-fee conversion from twenty-five qualified owner-occupants prior to initiating ROH ch. 38 proceedings." 100 Hawai'i 182, 193, 58 P.3d 1229, 1240 (2002) (brackets omitted) (emphasis deleted) (ellipsis points deleted). In *Coon,* this court ruled that DCS Rules § 2–3 (1993) [14] conflicted with ROH § 38–2.2, *see supra* note 12, because DCS Rules § 2–3 impermissibly lowered the minimum number of applicants required to trigger ROH ch. 38 proceedings pursuant to ROH § 38–2.2. 98 Hawai'i at 246–52, 47 P.3d at 361–67. "Consequently, this court held that the City's designation of The Kahala Beach condominium development for lease-to-fee conversion was invalid, void, and unenforceable, because the Department did not receive a sufficient number of qualified applications from The Kahala Beach condominium owners and, therefore, exceeded its authority pursuant to ROH § 38–2.2." *Ing,* 100 Hawai'i at 193, 58 P.3d at 1240 (citing *Coon,* 98 Hawai'i at 251, 47 P.3d. at 366). Furthermore, this court originally stated in *Takabuki II* that

[b]ecause the [Housing Finance and Development Corporation] is required to acquire and dispose of the leased fee interests of at least that number of houselots represented by statutory minimum number of applicants that it designates, *if, after a portion of a development tract has been designated pursuant to HRS § 516–22, the class of*

---

**14.** DCS Rules § 2–3 provided in relevant part:
Not less than 25 condominium owners by number, or 50% of the condominium owners of a development, whichever shall be the lesser

number, must apply as a condition precedent to the exercise of the power of eminent domain or the threat of eminent domain by the City.

*lessees whose houselots have been designated falls below the statutory minimum number of applicants for whatever reason, the HFDC will be required to terminate the proceedings* (and start again with a new designation only if enough qualified lessees can be found).

82 Hawai'i at 183, 921 P.2d at 103 (emphasis added).

In *Hsiung*, this court also addressed the contention that an amended designation provides the City and lessees with a second "trigger" date by which to qualify a minimum of twenty-five units for designation:

The subsequent amendments could not cure proceedings initiated based on a void and invalid designation. Additionally, we note that ... HRCP[ ] Rule 15(c) (2000)[ 15 ] offers no relief because " 'the rationale of the relation back rule 15(c) is to ameliorate the effect of the statute of limitations.' Here, there is no limitation of action problem. Thus, Rule 15(c) has no applicability." *Hanalei, BRC Inc. v. Porter*, 7 Haw. App. 304, 309–10, 760 P.2d 676, 680 (1988) (citation, brackets, and footnote omitted); *see also Chin Kee v. Kaeleku Sugar Co.*, 30 Haw. 17, 22 (1927); *Farber v. Wards Co., Inc.*, 825 F.2d 684, 689 (2d Cir.1987) ("Rule 15(c) governs the 'relation back' of amended pleadings only for the purpose of the statute of limitations, which is simply not implicated in this case."); *Doe v. O'Bannon*, 91 F.R.D. 442, 447 (E.D.Pa.1981) (" 'relation back' only exists for the purpose of ameliorating the effect of statutory bars to relief and not for the purpose of artificially assisting plaintiffs to fulfill constitutional prerequisites, such as standing" (citation omitted)).

109 Hawai'i at 178, 124 P.3d at 453 (footnote omitted). Hence, the City's amended designation adding units cannot cure the lack of the requisite twenty-five at the original designation.

Notwithstanding the conclusion that the date of the amended designation does not "relate back" to the original designation date for the purposes of whether there were twenty-five qualified applicant-units to initiate ROH ch. 38 proceedings, it follows from the foregoing discussion that if the numerosity requirement was met when *first* designated, then any properly added applicant-units may count toward the continuous maintenance of the minimum twenty-five units. In other words, if the lessees maintained at least twenty-five qualified units up to the date of an amended designation, then the number from the initial designation is added to the number of the amended designation for a total number of qualified units. If, thereafter, a unit drops out of the condemnation process or the lessee of another unit passes away, as long as the minimum number of twenty-five units is continuously maintained, the condemnation retains its public purpose and need not be terminated. Conversely, if there are *not* a minimum of twenty-five qualified units initially, then the addition of units with an amended designation is moot, inasmuch as the added units cannot cure the initial numerosity deficiency and the condemnation process must be terminated. As we have indicated, this conclusion is supported by the foregoing case law and we can likewise find no language in ROH ch. 38 that would preclude (1) the addition of qualified units by amended designation or (2) the enumeration of those added units toward the requirement that twenty-five qualified units must be continuously maintained.

Therefore, the City's amended designation adding six units could not serve to increase a previously insufficient number of qualified

---

**15.** HRCP Rule 15(c) provides:

(c) **Relation back of amendments.** An amendment of a pleading relates back to the date of the original pleading when

(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

applicant-units to the minimum twenty-five applicant-units necessary to initiate ROH ch. 38 proceedings. Conversely, the amendment of the original designation would allow added qualified applicant-units to count toward the previously existing minimum qualified twenty-five units continuously necessary for ROH ch. 38 proceedings.

### (c) *Whether qualification is based on when the lessees' application is filed with the City*

The lessees seek to reverse the circuit court's disqualification of applicants Chun–Hoon, Bellinger, and the Lumsdens from the condemnation proceedings based on their contention that all three units qualified on the date that their applications were filed with the City.

In *Hsiung,* the lessees challenged the circuit court's disqualification of applicants Ault and the Dixons based upon the circuit court's ruling that the applicants in question "owned fee simple property suitable for residential purposes within the City and County of Honolulu that was quitclaimed for no consideration to relatives shortly before or at the time they applied to participate in the condemnation proceedings." 109 Hawai'i at 171, 124 P.3d at 446. Similar to the Church's argument in the present matter, the opponents of the condemnation action argued that the circuit court was correct in disqualifying the applicants because "their transactions were similar to the creation of 'false poverty' to become eligible for government assistance programs or fraudulent conveyances." *Id.* This court concluded that the circuit court erred in disqualifying the applicants, reasoning as follows:

> The clear and unambiguous language of ROH § 38–2.4 provides that applicants are not eligible to participate in condemnation proceedings under ROH chapter 38 unless they "[d]o not own property in fee simple lands suitable for residential purposes within the City and County of Honolulu or have pending ... an unrefused application to lease or purchase residential real property for dwelling unit purposes." In the instant case, it is undisputed that, *at the time they applied and throughout the con-*

> demnation proceedings, neither Ault nor the Dixons owned fee simple property suitable for residential purposes within the City and County of Honolulu or had a pending, unrefused application to lease or purchase residential real property for dwelling unit purposes. Based on the plain language of the ordinance, we hold that the circuit court erred in ruling that Ault and the Dixons were not qualified to participate in condemnation proceedings under ROH chapter 38.

*Id.* (emphasis added).

In the present matter, "at the time they applied and throughout the condemnation proceedings," Bellinger, Chun–Hoon, and the Lumsdens neither "owned fee simple property suitable for residential purposes within the City and County of Honolulu or had a pending, unrefused application to lease or purchase residential real property for dwelling unit purposes." *Id.* Furthermore, the Church neither presented evidence nor argued in the circuit court that Bellinger, Chun–Hoon, or the Lumsdens were *not* qualified on the date that their applications were filed with the City. Based on *Hsiung,* the relevant date to determine whether a unit qualifies for ROH ch. 38 condemnation is when a lessee *files* an application with the City and not when the application is signed by the lessee. Given this conclusion, the circuit court erred in disqualifying applicants Bellinger, Chun–Hoon, and the Lumsdens based on its ruling that they owned property either at the time that they *signed* their applications or at some point between signing their applications and filing them with the City. Because the Church did not claim that Bellinger, Chun–Hoon, and the Lumsdens owned any disqualifying property as of the date that their applications were filed with the City, it has waived the argument on appeal.

### (d) *Whether lessees may initially qualify at the time of sale*

The lessees' further argue that ROH § 38–2.4 allows for applicants initially to qualify at the time of *sale* rather than the time that their applications are preliminarily approved by DCS. The lessees' attempt to shift the

requirements for qualification past the date that applications are filed is unavailing.

ROH § 38–2.4, *see supra* note 11, states that "[n]o sale of any condominium property land within a development shall be made unless the lessees" satisfy seven requirements. ROH 38–2.2, *see supra* note 12, requires that, in order for DCS to designate condominium land for acquisition by the City, "[a]t least 25 of all the condominium owners within the development or at least owners of 50 percent of the condominium units, whichever number is less, *apply to the department to purchase the leased fee interest pursuant to Section 38–2.4*, and file an application with the department." (Emphasis added.) By its plain language, ROH § 38–2.2 incorporates the requirements of section 2.4 into the minimum number of twenty-five condominium owners necessary for the City to initiate condemnation proceedings. Indeed, it would be absurd for the DCS to designate residential condominium land for acquisition by the City with a minimum group of twenty-five lessees who were unqualified to purchase the fee simple title to their units pursuant to ROH § 38–2.4. Such a construction of ROH § 38–2.4 would negate the requirement that there be a minimum number of condominium owners to initiate the designation, because the DCS could then allow applicants to join the designation who might never become qualified.

This court has construed ROH §§ 38–2.2 and 38–2.4 to require that applicants be qualified to purchase the fee simple title to their units at the time that they file an application with DCS. In *Hsiung*, we held that a lessee was properly disqualified from the group of applicants designated to acquire the fee to their condominium units because he owned property suitable for residential purposes. 109 Hawai'i at 171, 124 P.3d at 446. We stated that ROH § 38–2.4 required that lessee Poag not own property in fee simple suitable for residential purposes and rejected the lessees' claim that Poag should not have been disqualified because the property he owned was for business purposes. *Id. Hsiung* concluded:

> [T]he plain language of ROH § 38–2.4 is both unqualified and unambiguous: "No

sale of condominium land within a development shall be made unless the lessees ... [d]o not own property in fee simple lands suitable for residential purposes." There being no ambiguity in the ordinance, this court is not at liberty to look beyond its plain language. *See Ing*, 100 Hawai'i at 189–90, 58 P.3d at 1236–37 (citations omitted). Therefore, we hold that the circuit court did not err in ruling that Poag was not qualified to participate in condemnation proceedings under ROH chapter 38.

109 Hawai'i at 172, 124 P.3d at 447. *Hsiung* ultimately held that "the City initiated condemnation proceedings based on a designation that included, at most, 24 qualified applicants" and that "the failure to receive a sufficient number of qualified applications prior to initiating ROH ch[ ]. 38 proceedings results in an invalid, void, and unenforceable designation." 109 Hawai'i at 178, 124 P.3d at 453. That holding forecloses the proposition that ROH § 38–2.4 merely requires that lessees be qualified to purchase their units at the time of sale. Therefore, we have consistently required that lessees be qualified pursuant to ROH § 38–2.4 at the time that they filed their applications with the DCS, and ROH § 38–2.4, read *in pari materia* with ROH § 38–2.2, plainly reinforce that proposition.

### 3. *Conclusion*

In light of the foregoing, we hold that the time an application is *filed* with the City is the operative date for determining whether lessees initially qualify to purchase the fee simple interest in their condominium units pursuant to ROH § 38–2.4. Therefore, the circuit court's rationale for its July 8, 2004 denial of the lessees' motion for partial summary judgment, ruling that there were not qualified original or properly-added applicants for at least 25 units continuously throughout the legal proceedings to convert the leaseholds to fee simple, was erroneously based upon the finding that applicants Bellinger, Chun–Hoon, and the Lumsdens did not qualify at the time that they signed their applications. Accordingly, we vacate that portion of the circuit court's July 8, 2004 order and remand for further proceedings consistent with this opinion.

D. *The Honolulu City Council Did Not Improperly Delegate The Power Of Eminent Domain To The Department Of Community Service.*

1. *The parties' arguments*

a. *The Church's arguments*

The Church argues that the Honolulu City Council impermissibly delegated the power of eminent domain to the DCS in violation of HRS §§ 101–13, *see supra* note 5, and 101–14 (1993).[16] The Church contends that this court's decision in *Richardson*, 76 Hawai'i at 57–59, 868 P.2d at 1204–06, was only "a *facial* consideration of Ordinance 91–95 and the relevant State statutes" but that at the time this court ruled, "the City had not attempted to condemn any property under ROH [ch.] 38." (Emphasis in original.) The Church argues that the record in the present matter establishes that "the City is interpreting the law to mean that the decision of [the DCS] to designate property, far from being a 'preliminary step,' legally *mandates* the City Council to condemn the property." (Emphasis in original.) The result, according to the Church, is that ROH ch. 38, "as interpreted and applied by the City, reduced the City Council to a mere rubber stamp." The Church believes that the City Council was "instructed by its attorneys that it was 'mandated' to approve [the DCS]'s actions[ ] or it would be acting in violation of ROH [ch.] 38 and the Council members could face suit from the lessees." The Church concludes that "the Council did not have the authority to determine whether the taking was for a public purpose, because that had already been determined by [the DCS] and [the City Council was] bound by [the DCS]'s determination." The Church maintains that the lessees "cannot legally force the City to accommodate their desire for condemnation" and that "not only has the power [of eminent domain] been improperly delegated to [the DCS] in this case, it has been unlawfully co-opted by the [l]essees."

b. *The City's arguments*

The City argues that the circuit court correctly concluded that the city council did not improperly delegate its power of eminent domain to the DCS. The City maintains that the "public use" of this eminent domain practice has already been well established by this court in prior cases. The City asserts that because the Church "already obtained [a] complete judicial *de novo* review of the City's public use decision to proceed with an eminent domain action" in the circuit court, it may not "complain about the process that led to the filing of the eminent domain action." The City argues that this court's decision in *Takabuki v. Housing Finance and Dev. Corp.*, 72 Haw. 466, 822 P.2d 955 (1991) [*Takabuki I*], "confirms that it doesn't matter how many 'defects' the landowner thinks exist in the City Council's procedures" because "the landowner's recourse is to contest public use in the eminent domain case, which [the Church had] an opportunity to do in the [c]ircuit [c]ourt." Finally, the City avers that this court has already held in *Richardson* that "this process does not illegally delegate condemnation power to [DCS]."

c. *The lessees' arguments*

The lessees argue that the issue of improper delegation alleged as error in the Church's opening brief is not properly before this court "since [the] Church did not separately move to include that separately denied motion within the scope of the [HRCP] Rule 54(b) certification." The lessees contend that the City Council's resolutions approving the condemnation of qualified residential units within the Admiral Thomas "are entitled to a presumption of validity and judicial deference and should only be overturned upon a showing that the resolution approving the condemnation was arbitrary, unreasonable or invalid." The lessees join the City in arguing that the public purpose of ROH ch. 38 has

16. HRS § 101–14 provides:

**Plaintiff.** The attorney general of the State may, at the request of the head of any department of the State, or as otherwise provided by law, institute proceedings for the condemnation of property as provided for in this part.

Any county may institute proceedings in the name and on behalf of the county for the condemnation of property within the county for any of the purposes provided in this part which are within the powers granted to the county.

**70**

already been established by this court. The lessees maintain that "[t]here is no further discretion under the ordinance, except to determine if the actual number of [units] meets the specified qualification requirement."

### 2. *Analysis of the applicable law*

As a preliminary matter, we note that the issue of improper delegation is properly before this court. On July 8, 2004, the circuit court entered an order granting partial summary judgment in favor of the City and lessees by concluding that "the City Council did not improperly delegate the power of eminent domain." On September 21, 2004, the circuit court entered an order that, *inter alia,* granted the lessees' request for HRCP Rule 54(b) certification and directed the entry of final judgment as to the June 30, 2004 and the *July 8, 2004 orders.* Therefore, the Church did not need to separately move to include the issue of improper delegation in the HRCP Rule 54(b) certification because it was already part of the July 8, 2004 order that was so certified.

This court has already held that the City did not improperly delegate its power of eminent domain in *Richardson:*

> The Trustees next urge that "[t]he City lacks the authority to redelegate its eminent domain powers as attempted in Ordinance 91–95, because sections 2.2 (relating to condemnation of condominium development leaseholds), 3.2 (relating to condemnation of cooperative housing development leaseholds), and 4.2 (relating to condemnation of residential planned development leaseholds) of [ROH ch. 38] impermissibly transfer the City's limited condemnation power from the 'governing authority,' *i.e.,* the city council, prescribed by HRS § 101–13 (1985), to the City's Department of Housing and Community Development (the Department)." We disagree.
>
> The Trustees appear to have misread [ROH] §§ 38–2.2, 38–3.2, and 38–4.2 (Apr. 1992 Rev.). Although the Department is empowered to *designate* land for acquisition pursuant to these sections, by their very terms the Department merely *facilitates* the City's acquisition of the land subject to the decision of the City, through its

City Council, actually to *exercise* the power of eminent domain as prescribed by HRS §§ 101–13 and 101–14. In other words, the sections accord the Department the authority to assist the City's statutorily designated "governing authority" in the ultimate exercise of that power; they do not, and cannot, confer the power to condemn land on the Department itself.

> Because the Department's mere designation of land, as a means of facilitating its acquisition by the City, is only a preliminary step in the condemnation process that precedes the institution of eminent domain proceedings at the behest of the City Council, we hold that Ordinance 91–95 does not entail the sort of impermissible delegation of the power of eminent domain from the City Council to the Department that would violate HRS § 101–13.

76 Hawai'i at 57–59, 868 P.2d at 1204–06 (citations and footnotes omitted) (emphases in original). We disagree with the Church that this court's decision was only a "facial" consideration of ROH ch. 38. We fail to see how *Richardson* is not as equally applicable to the present matter as it was to the facts in that case. The *Richardson* court interpreted ROH § 38–2.2 to empower the DCS to *designate* land for acquisition by the City, which "merely *facilitates* the City's acquisition of the land subject to the decision of the City, through its City Council, actually to *exercise* the power of eminent domain." *Id.* at 58, 868 P.2d at 1205 (emphases in original). ROH § 38–2.2(a) performs the same function in the present matter:

> [T]he department may *designate* all or that portion of a development containing residential condominium land for acquisition, and *facilitate* the acquisition of the applicable leased fee interests in that land by the city through the *exercise* of the power of eminent domain or by purchase under the threat of eminent domain[.]

(Emphases added.) On its face, section (a) does not mandate that the City condemn the designated property.

The *Takabuki I* court addressed a challenge to the public purpose of designating residential lots for lease-to-fee conversion under HRS chapter 516 as follows:

HRS § 516–22 states in part:

> and if, after ... public hearing ... the authority finds the acquisition of the leased fee interest ... will effectuate the public purposes of this chapter.

In this case, appellants assert that the public hearing was pro forma only, attended by employees of the appellee corporation, that no findings were made at the hearing, and that the finding of public use in the resolution was not based upon what occurred at the hearing.

> It is obvious that the public hearing called for under HRS § 516–22 is not a contested case hearing....

> Thus it would appear that the public hearing called for under HRS § 516–22 serves only an informational purpose, and the agency's determination to proceed with a condemnation of a tract of land because it would serve the public purpose does not depend upon some form of prior hearing.

> Proceedings under HRS Chapter 516 are, however, not unique in this regard. Agencies with the power of eminent domain reach a determination to proceed with an action as being for the public use administratively in the usual case.

> That does not mean, however, that the landowner has no means of contesting public use, since HRS § 101–34 [ (1993) [17]] expressly provides that if the landowner properly raises the question of whether there is a public use, the issue can be separated out and tried and indeed appealed in advance of the valuation trial.

> Thus, we hold that [the Housing Finance and Development Corporation] had the power to adopt the resolution in question. *The appellants, however, have the right in the eminent domain proceedings under HRS § 101–34 to contest the public use, and that includes a contest of whether or not the prerequisites to such a condemnation set forth in the various provisions of HRS Chapter 516 such as the size of the tract, the number of the persons applying, etc., have been met.* Issues raised as to those qualifications are factual issues which the landowner is entitled to try, de novo, before the circuit court in an evidentiary hearing, despite any previous determination with respect thereto by the appellee. *Since the appellants have a complete, constitutional, and adequate remedy by which they can raise the issue of public use in the eminent domain proceedings, they have no appeal from the adoption of the resolution in question.*

72 Haw. at 467–68, 822 P.2d at 955–56 (emphases added).

The applicability of *Takabuki I's* analysis to ROH ch. 38's stated public purpose is explained in this court's recent decision in *Kau:*

> ROH chapter 38 (entitled "Residential Condominium, Cooperative Housing and Residential Planned Development Leasehold Conversions"), enacted by City and County of Honolulu Ordinance 91–95 (1995), is modeled after HRS chapter 516 (known as the Hawai'i Land Reform Act (HLRA)). *Richardson v. City and County of Honolulu,* 802 F.Supp. 326, 340 (D.Haw. 1992); *see generally, Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 868 P.2d 1193 (1994) (outlining Hawai'i's involuntary fee conversion scheme under state statute and county ordinance and stating that both HRS chapter 516 (HLRA) and ordinance 91–95 (presently codified as ROH chapter 38) appertain to involuntary fee conversion; however, the statute and ordinance cover different subject matter—the HLRA applies to land underlying single family homes and ROH

---

17. HRS § 101–34 provides:

**Issue as to use may be set for immediate trial.** If the defendant in the defendant's answer, or in return to the order to show cause, issued under section 101–28, denies that the use for which the property sought to be condemned is a public use, or a superior public use within the meaning of section 101–7, the issue may, upon the motion of any party, be set for immediate trial, without a jury and without regard to position on the calendar. Notwithstanding any provision of section 641–1, an interlocutory appeal shall lie from the decision on the issue as of right, and the appeal shall be given precedence in the supreme court. Failure of the defendant to raise the issue within ten days after service of an order granting immediate possession shall be deemed an admission that the use is a public use or a superior public use, as the case may be.

chapter 38 applies to condominium, cooperative housing and planned development units.) The intended similarity between ROH chapter 38 and the HLRA is evident in the City Council's statement regarding the purpose of the Ordinance: "[t]he purpose of this measure is to provide to the leasehold owners of condominium properties the same right to purchase the land under their homes as is currently provided the owners of single family dwellings...." *See Coon,* 98 Hawai'i at 251 n. 27, 47 P.3d at 366 n. 27 (citing the report of the City Council Committee on Housing, Committee Report No. 545 (1991)).

*Kau,* 104 Hawai'i at 477, 92 P.3d at 486. As *Kau* illustrates, the public purpose requirement underlying ROH ch. 38 condemnation has been satisfied as a matter of law. *Id.*

In *Richardson v. City and County of Honolulu,* 124 F.3d 1150 (1997), the United States Court of Appeals for the Ninth Circuit held that Ordinance 91–95 (codified as ROH chapter 38) is constitutional: "[i]n summary, we hold that Ordinance 91–95 (the lease to fee ordinance) is constitutional. The Ordinance admittedly takes private property, but it does so for a sufficiently public purpose and no constitutional deprivation has as yet been established." *Richardson,* 124 F.3d at 1166.

Similarly, we previously held in *HFDC* that the HLRA accomplished a public purpose within the meaning of the HLRA and the United States and Hawai'i Constitutions. *HFDC,* 79 Hawai'i at 90, 898 P.2d at 602. After reviewing the public purpose elucidated in the express language of the HLRA, its legislative history, and earlier case law, we held that the HLRA continues to accomplish a public purpose within the meaning of the HLRA and the United State and Hawai'i Constitutions. *Id.* at 91–92, 898 P.2d at 603–04. In reaching this conclusion, we discussed the legislative findings and stated purpose of the HLRA and held as follows:

> We therefore hold that once the legislature has spoken on the social issue involved, so long as the exercise of the eminent domain power is rationally related to the objective sought, the legisla-

> tive public use declaration should be upheld unless it is palpably without reasonable foundation. The crucial inquiry is whether the legislature might reasonably ... have believed that application of the sovereign's condemnation powers would accomplish the public use goal.
>
> ....
>
> These are legitimate public purposes. The employment of the state's eminent domain authority to redistribute fees simple to correct socio-economic problems attributed by the legislature to a land oligopoly is a rational means to accomplish these ends.

*Id.* at 85, 898 P.2d at 597 (alteration in original).

....

[I]n *HFDC,* ... the fee owners proposed that "public purpose" determinations be made on a case-by-case basis as a function of the particular "time" and general economic "circumstances" at the time of condemnation. *Id.* at 87, 898 P.2d at 599. We held that the fee owners in that case were mistaken and that the public purpose requirement of the HLRA would be satisfied as a matter of law by the lessees' compliance with its threshold requirements of the number and qualifications of applying lessees and the condemning authority's determination that its acquisition will effectuate the public purpose of the HLRA:

> Put more succinctly, pursuant to HRS § 516–22, the HFDC's sole function is to determine that the necessary *quantum* of lessees have *applied* for purchase of their leased fee interests in residential lots situated in a qualifying "development tract," *see* HRS § 516–1, supra note 1, in conformity with the preconditions enumerated in HRS § 516–33, and that the acquisition *by the HFDC* will *effectuate* the public purposes of the HLRA.
>
> .. ....
>
> These determinations of the number and qualifications of applying lessees and the "effectuation" of the public purposes of the HLRA—which are all that are required of the HFDC by HRS

§ 516–22—are a far cry from a reexamination of the question whether any given acquisition would in fact accomplish the legislature's articulated public purposes, a feat that the United States Supreme Court ruled that even the legislature was not required to accomplish in the first instance. [*Hawai'i Housing Authority v.] Midkiff,* 467 U.S. [229] at 242[, 104 S.Ct. 2321, 81 L.Ed.2d 186] . . . [(1984) ].

*Id.* at 88–89, 898 P.2d at 600–01.

*Kau,* 104 Hawai'i at 478–79, 92 P.3d at 487–88 (emphases in original).

In the present matter, the DCS properly designated the Admiral Thomas for acquisition pursuant to ROH § 38–2.2 and the City properly exercised its power of eminent domain in determining that the designation effectuated a public purpose. The Church then challenged the DCS's findings that the minimum number of twenty-five units qualified for ROH ch. 38 conversion, and the circuit court conducted a hearing that evaluated, *inter alia,* whether there were qualified applicants for at least twenty-five units in the Admiral Thomas. Thus, per this court's conclusion in *Kau,* "[c]onsidering both the history of ROH ch[.] 38 and its close relationship with the HLRA and our holding in *HFDC,*" 104 Hawai'i at 479, 92 P.3d at 488, the public purpose of ROH ch. 38 has been satisfied as a matter of law in this case.

### 3. *Conclusion*

In light of the foregoing, we hold that the Honolulu City Council did not improperly delegate the power of eminent domain to the DCS. Therefore, we affirm the circuit court's July 8, 2004 grant of the lessees' motion for partial summary judgment on the issue of improper delegation.

### E. *The Affidavits Of Sally Cravalho, Administrator Of The City's Leasehold Conversion Program, Meet The Requirements Of HRCP Rule 56(e).*

#### 1. *The parties' arguments*

##### a. *The Church's arguments*

The Church argues that Cravalho's affidavits do not comply with HRCP Rule 56(e),
*see supra* note 4, and that their conclusions that the lessees were qualified under ROH ch. 38 constituted inadmissable hearsay. The Church contends that the lessees "adduced no independent evidence that [they] were in fact qualified and that public purpose has been met." Notwithstanding the Church's citation to *GECC Finan. Corp. v. Jaffarian,* 79 Hawai'i 516, 525, 904 P.2d 530, 539 (App.1995), for support that "[a]ffidavits which state ultimate or conclusory facts or conclusions of law cannot be utilized in support of a motion for summary judgment," it fails to explicate how Cravalho's affidavits are hearsay. The Church likewise does not suggest how the DCS might help "facilitate the acquisition of the applicable leased fee interests in that land by the city," ROH § 38–2.2(a), without qualifying lessees in a manner such as that employed by Cravalho in the present matter. The Church quotes *Takabuki I* as stating that "[i]ssues raised as to those qualifications are factual issues which the landowner is entitled to try, de novo, before the circuit court in an evidentiary hearing," 72 Haw. at 468, 822 P.2d at 956, and thus concludes that "Cravalho's hearsay assertions regarding the [l]essees and their alleged qualification should have been disregarded by the [circuit] court."

##### b. *The City's arguments*

The City argues that Cravalho's affidavits "clearly comply with the rules." The City avers that "[a]s the person directly involved in the process of reviewing lessees' applications and evaluating the lessees' qualifications, [Cravalho] is clearly the appropriate person to testify as to the facts and materials reviewed and conclusions reached by [DCS] with regard to lessees' qualifications." Thus, the City concludes, Cravalho "obviously has personal knowledge of relevant facts regarding the lessees and is competent to testify regarding these facts" in compliance with HRCP Rule 56(e).

##### c. *The lessees' arguments*

The lessees argue that the circuit court correctly concluded that Cravalho's affidavits comply with HRCP Rule 56(e). The lessees

contend that the Church is attempting "to contest the very information that the City is required to collect about an applicant in order to determine if the applicant is qualified to purchase the fee" simple title to his or her unit. The lessees insist that Cravalho was "directly involved in the process of qualifying applicants based on [ROH ch.] 38's express directives to [the DCS] and pursuant to the rules promulgated to effectuate the purpose of [ROH ch.] 38." The lessees argue that since ROH ch. 38 "specifically appoints [the DCS] to administer the application process," "Cravalho's efforts to review and qualify applicants were in fact performed within the scope of her official duties and are made upon her own 'personal knowledge of the matters testified herein,' as stated in her general affidavit." The lessees urge that Cravalho's affidavits were based on the filed affidavits of the lessees and that it "is the responsibility of the City officials, through the DCS, to review the filed applications, then gather, compile and opine on the ability of the applicants to qualify under the criteria established in [ROH ch.] 38."

The lessees argue that Cravalho properly authenticated the record pursuant to Hawai'i Rules of Evidence (HRE) Rule 901(a) and (b)(7). The lessees importune that "[e]ven if these public records were somehow considered to be hearsay, they clearly are admissible under any of several exceptions to the hearsay rule, including [HRE Rules] 803(b)(6) [ (1993 & Supp.2002) [18]], 803(b)(8) [ (1993),[19]] and 803(b)(24) [ (1993) [20]]."

Finally, the lessees contend that the Church "has not presented any evidence to demonstrate that Cravalho did not in fact have the stated personal knowledge and competency to testify to the matters within the scope of her official duties under [ROH ch. 38] and DCS rules."

### 2. *Analysis of the applicable law*

As a preliminary matter, we note that the circuit court did not specifically rule in its June 30 or July 8, 2004 orders regarding the admissibility of Cravalho's affidavits, the only two orders included in the circuit court's September 21, 2004 HRCP Rule 54(b) certification. Nevertheless, the Church raised the issue in its memorandum in opposition to the lessees' April 29, 2004 motion for partial summary judgment on the issue of the qualifications of the individual lessees to purchase the fee interest in their units pursuant to ROH ch. 38. Thus, the issue is substantively within the circuit court's July 8,

---

18. HRE Rule 803(b)(6) provides for the following exception to the general exclusion of hearsay:

Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in the course of a regularly conducted activity, at or near the time of the acts, events, conditions, opinions, or diagnoses, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with [HRE R]ule 902(11) or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

19. HRE Rule 803(b)(8) provides for the following exception to the general exclusion of hearsay:

Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil proceedings and against the government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

20. HRE Rule 803(b)(24) provides for the following exception to the general exclusion of hearsay:

Other exceptions. A statement not specifically covered by any of the exceptions in this paragraph (b) but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (B) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

2004 order. Furthermore, the circuit court had orally concluded that "the affidavit from the City was adequate."

On April 29, 2004, Cravalho submitted affidavits in support of each Admiral Thomas unit, attesting to the qualifications of the lessees. Pursuant to ROH §§ 38–1.7 [21] and 1.8,[22] the DCS was responsible for administering ROH ch. 38. In so doing, Cravalho, as administrator of the leasehold conversion program at DCS, gathered and reviewed the records of the lessees.

HRCP Rule 56(e) provides in relevant part that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

HRE Rule 801 (1993 & Supp.2002) provides in relevant part that " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." HRE Rule 802 (1993) provides that "[h]earsay is not admissible except as provided by these rules, or by other rules prescribed by the Hawaii supreme court, or by statute."

"[W]e believe that HRCP Rule 56(e) provides substance through form. It is the only way that a circuit court, amidst all of its other duties, can efficiently and uniformly insure that summary judgment is granted or not granted based upon evidence that will be admissible at trial." *Pioneer Mill Co. v. Dow,* 90 Hawai'i 289, 298, 978 P.2d 727, 736 (1999).

In our view, the City and the lessees *do* offer Cravalho's affidavits "to prove the truth of the matter asserted," to wit, that the lessees are qualified pursuant to ROH ch. 38 to have their leasehold interests in their condominium units converted into fee simple. Therefore, Cravalho's affidavits violate the rule against hearsay unless they fall under one of the hearsay exceptions.

HRE Rule 803(b)(8) allows as an exception to the rule against hearsay "data compilations, in any form, of public offices or agencies, setting forth ... (C) ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Cravalho's affidavits meet the "literal requirements" of HRE Rule 803(b)(8)(C). *Robbins v. Whelan,* 653 F.2d 47, 50 (1st Cir.1981). They are a data compilation of a public agency. The findings they "set forth are purely factual, and resulted from a detailed inquiry that the agency undertook," *see* ROH § 38–2.4, "pursuant to its statutory authority," *see* ROH § 38–1.8. *Robbins,* 653 F.2d at 50; *cf. Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 164, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) ("[T]he language of the [Federal Rules of Evidence Rule 803(8)(C) [23]] does not compel us to reject the interpretation that 'factual findings' includes conclusions or opinions that flow from factual investigation."). "Because public records are presumed to be trustworthy, 'the burden of proof concerning the admissibility of public records is on the party opposing their introduction.' " *Columbia First Bank v. United States,* 58 Fed.Cl. 333, 339 (2003) (brackets and citation omitted). Therefore, despite the Church's contention that the lessees "adduced no independent evidence that [they] were in fact qualified," it was not the lessees' burden to do so. In any event, the investigation's "sources of information" and "other

---

**21.** ROH § 38–1.7 provides that "[t]he department of housing and community development shall administer this chapter."

**22.** ROH § 38–1.8 provides in relevant part:
In addition to any other duty prescribed by law and in this chapter, the director of the department of housing and community development shall:
....
(b) Be responsible for enforcement of this chapter and the rules adopted pursuant to it;
....

(f) Facilitate the acquisition of all necessary property interests by the city through eminent domain proceedings as provided in this chapter;
....
(i) Do all things necessary and convenient to carry out the powers expressly conferred upon the director by this chapter.

**23.** Federal Rules of Evidence Rule 803(8)(C) is textually equivalent to HRE Rule 803(b)(8)(C).

circumstances," such as the applicants' affidavits, title reports, and the City real property tax record establish trustworthiness. *See Fraley v. Rockwell Int'l Corp.*, 470 F.Supp. 1264, 1267 (S.D.Ohio 1979) ("Although the author relied in part on witness' statements, these statements were made by declarants with first-hand knowledge of the facts."). Based on the foregoing, we hold that Cravalho's affidavits fall under the "public records and reports" exception to the rule against hearsay codified in HRE Rule 803(b)(8)(C).

Although we determine that Cravalho's affidavits are admissible under the exception to the hearsay rule in HRE Rule 803(b)(8)(C), we nonetheless hold that the affidavits lack sufficient evidence to show that the lessees qualify under all the necessary terms of ROH ch. 38. *See* ROH § 38–2.4(a), *supra* note 11.

Cravalho's affidavits are not probative of the fact that the lessees qualified at the time that their applications were filed with the City, the date that we hold to be operative in determining eligibility, *see supra* section III. C.2., to the extent that the lessees signed the applications significantly in advance of their filing. By way of illustration, Cravalho "determined" "that Unit 2901," owned by the Lumsdens, was "held by a qualified owner-occupant of The Admiral Thomas," based upon information submitted by the Lumsdens, *i.e.*, their application signed August 31, 1995, and other documentation that Cravalho compiled. In support of the requirement that the Lumsdens are "owner-occupants" of Unit 2901, pursuant to ROH § 38–1.2, Cravalho's affidavit lists the following nine items, copies of the first eight of which being attached as exhibits: (1) the application, signed August 31, 1995, in which the Lumsdens state that their residence is Unit 2901 and that they are bona fide residents of the State of Hawai'i; (2) the Lumsdens' August 31, 1995 affidavit stating that Unit 2901 is their principal place of residence; (3) the Lumsdens' leased fee interest purchase contract, signed September 19, 2001; (4) a confirmation of terms, obligations, covenants and conditions of leased fee interest purchase contract, signed by the Lumsdens on August 5,

2002; (5) TMK grantor-grantee reports; (6) the apartment lease for Unit 2901, dated July 9, 1980, signed by the Lumsdens; (7) a preliminary title report; (8) the City and County of Honolulu's real property tax record and homeowner exemption for years 1988 through 2004; and (9) communications with the Lumsdens. Under item (3), for example, Cravalho states that the leased fee interest purchase contract "confirms that [the Lumsdens] meet all requirements under ROH [ch.] 38." The leased fee interest purchase contract states, among definitions of the parties and terms and other information pertaining to the purchase of the unit, that the buyers are the Lumsdens "whose residence and mailing address is 1221 Victoria Street, Apartment 2901, Honolulu, Hawaii 96814." (Capitalization altered.) Without more, it is impossible to evaluate, based upon the leased fee purchase contract alone, how the contract "confirms that [the Lumsdens] meet all requirements under ROH Chapter 38."

Furthermore, the affidavits fail to demonstrate that each condominium unit has served "as the individual's principal place of residence for a period of not less than one year immediately prior to application for conversion" in accordance with ROH § 38–1.2. The foregoing list in Cravalho's affidavit attesting to the qualifications of the Lumsdens does not establish that they *resided* in Unit 2901 for the year prior to their application for conversion.

To clarify, notwithstanding our conclusion that Cravalho's affidavits alone contain insufficient evidence for this court to evaluate whether the applicants qualify under ROH ch. 38, we do not find Cravalho's affidavits to expressly lack "trustworthiness." There is a manifest difference between accepting the material contained within Cravalho's affidavits as true and lacking sufficient evidence to evaluate truthfulness.

### 3. *Conclusion*

Based on the foregoing, we hold that Cravalho's affidavits do not violate HRCP Rule 56(e) and that the circuit court did not err in concluding that the affidavits were admissible. Nevertheless, the only evidence adduced in the circuit court as to the qualifica-

tions of the applicants was found within Cravalho's affidavits, which we consider to be insufficiently probative. Because this court is not obligated to sift through a voluminous record to verify an appellant's inadequately documented contentions, *see Miyamoto v. Lum*, 104 Hawai'i 1, 11 n. 14, 84 P.3d 509, 519 n. 14 (2004); *Traders Travel Int'l, Inc. v. Howser*, 69 Haw. 609, 616, 753 P.2d 244, 248 (1988), it remains within the province of the circuit court to determine the ROH ch. 38 qualification of the lessees. Hence, we (1) vacate the July 8, 2005 order of the circuit court to the extent that it ruled that there were not twenty-five qualified applicants throughout the proceedings to acquire the fee and (2) remand for proceedings consistent with this opinion, including a determination as to whether there are the requisite number of qualified applicants, their qualifications to be determined from the date that their applications were filed with the City, and, if so, to consider evidence of the fair market value of the leased fee interest being acquired.

## IV. *CONCLUSION*

In sum, we hold (1) that ROH ch. 38 does not provide an exception to lease-to-fee conversion of "mixed-use" buildings, (2) that RLUIPA does not provide a defense to condemnation of the Admiral Thomas condominium complex units owned in fee simple by the Church, (3) that the City Council did not impermissibly delegate the power of eminent domain to the Department of Community Services, (4) that Cravalho's affidavits do not violate HRCP Rule 56(e), and (5) that there are genuine issues of material fact regarding the qualifications of individual lessees to acquire the fee pursuant to ROH ch. 38.

Accordingly, we affirm the circuit court's grant of summary judgment in favor of the City and lessees, which ruled that RLUIPA is not applicable as a defense to condemnation and that the City Council did not improperly delegate the power of eminent domain. However, we reverse the circuit court's ruling that ROH ch. 38 is inapplicable to the Admiral Thomas condominium complex, inasmuch as there are no genuine issues of material fact as to whether that the Admiral Thomas is a residential condominium property regime project created under HRS ch. 514A. In addition, we vacate the circuit court's denial of partial summary judgment based on its ruling that there were not qualified applicants for at least twenty-five units and remand for further proceedings consistent with this opinion to determine whether there are sufficient qualified units for conversion to fee simple and, if so, to consider evidence of the fair market value of the leased fee interest being acquired.